TECUMSEH PRODUCTS COMPANY, Respondent, v. WISCONSIN EMPLOYMENT RELATIONS BOARD, Appellant: LODGE 1259, INTERNATIONAL ASSOCIATION OF MACHINISTS, A.F.L.–C.I.O., Intervening Respondent. [Two cases.]

*February 6—March 6, 1964.*

For the appellant the cause was argued by *Beatrice Lampert,* assistant attorney general, with whom on the briefs was *George Thompson,* attorney general.

For the respondent there was a brief by *Foley, Sammond & Lardner,* attorneys, and *Herbert P. Wiedemann* of counsel, all of Milwaukee, and oral argument by *Mr. Wiedemann.*

For the intervening respondent there were briefs by *Robert E. Gratz,* attorney, and *Gratz & Shneidman* of counsel, all of Milwaukee, and oral argument by *Robert E. Gratz.*

WILKIE, J.

## 1. *Composition of the W.E.R.B.*

Before examining the merits of the issues which were determined by the W.E.R.B., we shall first consider two preliminary matters advanced by the respondent. The first relates to a claimed improper procedure involving the composition of the W.E.R.B. Arvid M. Anderson, having been previously appointed to the board, was confirmed in that position in June, 1961, but he did not take his oath of office until January 15, 1962. He was not a member of the board at the time of the hearing in this matter. The two other members, Chairman Slavney and Mr. Fitzgibbon, were present and attended the hearing. Mr. Anderson joined with Chairman Slavney in the majority decision with reference to "downtime" and Mr. Fitzgibbon dissented. The order was made on April 11, 1962, at which time Mr. Anderson was regularly a member of the board, and several months after he had had an opportunity to examine the transcript of the proceedings.

We do not consider that it was necessary that Mr. Anderson be qualified as a member of the board at the time the hearing was held. In administrative proceedings, due process does not require that evidence be taken before the officer who ultimately decides the matter. If the respondent's position were correct in this regard, the common practice of having testimony taken before trial examiners would be placed in jeopardy. The cases on this subject are collected in an annotation in 18 A. L. R. (2d) 606. See also 2 Davis, Administrative Law Treatise, p. 39, sec. 11.02. The Wisconsin supreme court recently was faced with a similar type of problem in *State ex rel. Cities S. O. Co. v. Board of Appeals* (1963), 21 Wis. (2d) 516, 124 N. W. (2d) 809, wherein, at pages 541 and 542, we determined that a member of a

zoning board who did not hear the entire proceeding was nonetheless competent to participate in the decision.

## 2. *Jurisdiction.*

Although it was not relied upon by the trial court, the W.E.R.B.'s alleged lack of jurisdiction is now urged by the respondent as a basis for affirmance of the circuit court's judgment, which set aside the board's orders. The thrust of this contention is that a state administrative agency, as opposed to a state court, is not empowered to apply federal law in accordance with sec. 301 (a) of the Labor Management Relations Act of 1947, and the federal decisions relating thereto. The federal statute authorized suits involving violations of collective-bargaining contracts to be heard in the federal district courts.

The law to be applied in connection with such suits under sec. 301 (a) was determined to be a federal substantive law of collective-bargaining agreements, as fashioned by the federal courts. *Textile Workers v. Lincoln Mills* (1957), 353 U. S. 448, 77 Sup. Ct. 912, 1 L. Ed. (2d) 972. However, the jurisdiction of the federal courts was found not to be exclusive; states retained their pre-existing jurisdiction over such disputes. *Dowd Box Co. v. Courtney* (1962), 368 U. S. 502, 82 Sup. Ct. 519, 7 L. Ed. (2d) 483. Shortly thereafter, the United States supreme court determined that even if the suit were conducted in a state tribunal, if the issues were of a kind covered by sec. 301 (a), such issues were to be resolved "according to the precepts of federal labor policy." *Local 174, Teamsters Union v. Lucas Flour Co.* (1962), 369 U. S. 95, 103, 82 Sup. Ct. 571, 7 L. Ed. (2d) 593. See also *Markham v. American Motors Corp.* (decided March 3, 1964), 22 Wis. (2d) 680, 126 N. W. (2d) 753. In effect, the *Lucas Flour Case* determined that although state forums may adjudicate labor-management

disputes in industries which affect commerce, they must apply federal substantive law.

We now turn to the question of whether the W.E.R.B. is authorized to perform this function. The answer to this question depends upon our state law. We consider that a state is free to allocate judicial power within its own boundaries as it sees fit, without thereby contravening any federal interests. We think this follows from *Dreyer v. Illinois* (1902), 187 U. S. 71, 83, 23 Sup. Ct. 28, 47 L. Ed. 79, where the United States supreme court stated:

"A local statute investing a collection of persons not of the judicial department with powers that are judicial . . . presents no question under the Constitution of the United States. . . . Whether the legislative, executive, and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of government, is for the determination of the State."

See also *Uphaus v. Wyman* (1959), 360 U. S. 72, 79 Sup. Ct. 1040, 3 L. Ed. (2d) 1090.

Moreover, nothing in the substantive federal labor law precludes adjudication by W.E.R.B. of collective-agreement disputes. In a recent decision the United States supreme court has held that a federal administrative agency may apply the federal substantive law of collective agreements in pursuance of such agency's statutory power to resolve disputes arising under collective agreements. *International Association of Machinists v. Central Airlines, Inc.* (1963), 372 U. S. 682, 83 Sup. Ct. 956, 10 L. Ed. (2d) 67.

The Wisconsin statutes prescribing the powers and duties of the W.E.R.B. antedated the existence of a federal substantive law of labor-management agreements, which remained undefined until the *Lincoln Mills Case* in 1957. However, we believe that the purpose and the policies

expressed by the Wisconsin legislature in creating the W.E.R.B. make it clear that it was intended that the W.E.R.B. have the authority to resolve such disputes in Wisconsin, whether state or federal rules are to be applied. This is consistent with the desire to substitute the "processes of justice for the more primitive methods of trial by combat." Sec. 111.01 (4), Stats.

We conclude that the W.E.R.B. has jurisdiction to apply federal common law of collective-bargaining agreements in the resolution of disputes under sec. 111.06 (1) (f), Stats. Review of the board's decisions and orders can be had under ch. 227, Stats.

### 3. *Scope of Review.*

A construction of the meaning of the term "job" in sec. 14 (F), art. VI, and a determination as to whether sec. 4 or sec. 1 of art. X applies to the wage dispute, are conclusions of law.

To resolve disputes such as these, the board must apply certain standards, either expressly stated in the agreement or derived from the board's knowledge of industrial relations, if the agreement is silent, to certain determined facts. The application of a standard to certain facts to dispose of a dispute involves a conclusion of law. *Milwaukee Transformer Co. v. Industrial Comm.* (decided February 4, 1964), 22 Wis. (2d) 502, 126 N. W. (2d) 6. This court, however, will not independently redetermine every legal conclusion of the board. If the board's construction of the agreement is reasonable, this court will sustain the board's view, even though an alternative view may be equally reasonable. *Milwaukee Transformer Co. v. Industrial Comm., supra.* The reasonableness of the board's determination will be assessed not only from the point of view of the express criteria for judgment set forth in the agreement, but, because the

express standards of the agreement are often purposefully general and indeterminate, the board's determination must also be evaluated in terms of the "common law of the shop" —general practices and principles of industrial relations which are part of the context in which every collective agreement is negotiated, although not expressed in the contract as criteria for judgment.[7]

### 4. *Downtime.*

To resolve the issue as to downtime requires both a comprehension of the physical operation of the assembly line and an interpretation of the contractual provisions. The trial court found the board's decision "arbitrary and capricious," having first determined that downtime was not to be paid "except where the production line was closed down."

Our understanding of the facts which were presented to the board does not justify the circuit court's conclusion. There was, indeed, testimony that the company had previously never paid downtime unless the production line was actually stopped. However, there was no testimony that a comparable situation had actually ever arisen. The contract itself (sec. 4, art. X) restricts downtime to occasions when an employee "encounters unavoidable delays beyond his control." It specifically requires that the delay be brought to the attention of the foreman "immediately." These special circumstances occurred in the instant case; the record is devoid of proof that they had ever arisen previously. For this reason, past practice in the plant is not deemed controlling.

---

[7] *United Steelworkers v. Warrior & Gulf Navigation Co.* (1960), 363 U. S. 574, 80 Sup. Ct. 1347, 4 L. Ed. (2d) 1409. See also Cox, Reflections Upon Labor Arbitration, 72 Harvard Law Review, 1482, 1490–1492. This article was cited with approval in *Warrior & Gulf Navigation Co., supra.*

It is true, as the company argues, that as long as some members of the group were working, the entire group was "achieving paid production." However, as applied to group incentive workers, sec. 4, art. X, may be viewed not as an earning opportunity provision, but rather as a regulation of the pace of work.

Given a total production schedule for a shift which would permit an earning opportunity of 130 percent, and given the fact that during the shift a number of "pots" may move empty down the line because of good-faith management errors, it follows that all workers must accelerate the pace of work above the standard "task" set for an earnings opportunity of 130 percent in order to earn 130 percent. "Downtime" may reasonably be viewed as additional compensation for having to accelerate the pace of work above a given task standard in order to obtain the earnings opportunities predicated upon that "task."

To illustrate, assume that the entire line was down for fifteen minutes due to conditions other than a shortage of materials. Further assume that the earnings of the group are 130 percent of the base rate for the entire shift. The company concedes that under these circumstances all group incentive workers would be entitled to downtime pay. This hypothetical situation is no different in principle from the instant case. In order to have earned 130 percent of base, all workers would have had to accelerate the pace of work above the task set for earnings opportunity of 130 percent. Whether the entire line is down or whether some men are working is immaterial when the provision is viewed as a means of providing additional compensation for a "speedup."

Further assume a single incentive worker is "down" for fifteen minutes due to the same circumstances present in this case. Assume that his earnings are 130 percent of base for the shift in question; again, the company concedes that he is

entitled to "downtime pay," and again, in principle the situation is identical to the instant case. The individual worker has earned 130 percent of base in spite of downtime because he has increased the pace of work above "task." For the purpose of determining "task" and establishing earnings opportunities, and for the purpose of calculating the actual incentive earnings made during a single shift, the agreement treats group incentive units as a single person.

For these reasons, we conclude that the board's determination of the wage incentive dispute was based upon a reasonable view of the contract.

### 5. *The Leave of Absence.*

After her authorized leave of absence, Mrs. Prahl was not returned to her same job until sixteen days had passed. In the interim, she was given a job which resulted in her being paid $15 a week less than her former job. The W.E.R.B.'s order in her favor was set aside by the circuit court, which noted that, "Another lady was about to leave her job, making way for Mrs. Prahl to return to her precise former station." The circuit court concluded as follows:

"It would be unreasonable to hold the company to such a strict interpretation of the agreement as that sought by the union and determined by the board. It is the court's finding that the decision of the board in finding for the union on the question of 'leave of absence' is unsupported by substantial evidence, and that such decision on the so-called 'leave of absence' issue is arbitrary and capricious."

We are unable to agree with the learned trial court. The "past practice" of the parties in relation to this issue was equivocal. On one hand the company offered examples of workers returning after a leave of absence to their "old" classification, but performing different tasks in different departments, and the union, on the other hand, offered ex-

amples of persons being returned to at least the "old" task pattern, if not the same department and work station.

The company offered some negotiation history in support of its position. A worker who had been classified as a gear hobber returned from a military leave of absence and asked to be assigned to the precise *machine* he had worked on previously. After some communications with the Veterans' Service Office, it was felt that federal military service law entitled the man to return to his "old" machine. It was after this incident that the present agreement was negotiated, and in that negotiation, sec. 14 (F), art. VI, was revised to make reference to sec. 14 (D), art. VI, the military-leave section. The company argues that the express exception of military leaves of absence from sec. 14 (F), art. VI, permitting service men to return to previous work stations, indicates that given a leave of absence for any other reason, the returnee need only be assigned to his old classification.

However, Mrs. Prahl does not seek to return to her precise pre-existing work station. She simply seeks to return to the same task—a station on a group incentive line. Therefore, the negotiation history is not relevant.

Sec. 14 (D), art. VI, could well permit returning servicemen to return to a precise job station, whereas all others given superior seniority could only be expected to be returned to the same job content, irrespective of precise station.

The company offered other examples of past practice in relation to the construction of the term "job." However, these examples involved contexts other than that presented by a person returning from a leave of absence and finding junior workers performing his old task patterns. Hence, these illustrations have no relevancy.

The classifications in Exhibit A are not of the same magnitude. Some classifications, punch press, welder, have a constant job content, others such as subassembly, have

variable job content. Therefore, the board could reasonably conclude that Exhibit A of the agreement had little relevancy in the construction of sec. 14 (F).

The board could reasonably conclude that a primary function of seniority is protection of take-home earnings. While it is true that all tasks within the subassembly classification permit incentive opportunities, the variation in job content within the classification has an impact on take-home pay. If a worker could be freely assigned to any task within the classification, regardless of seniority, he would continually be required to learn new skills. During the initial "education" period his decreased efficiency would reduce his wages. Hence, the seniority provision preserves to the senior worker the option of choosing between secure take-home pay predicated upon performing a mastered task, or the acquisition of new skills and wider earnings opportunities. Section 14 (F) may reasonably be construed to permit a person returning from a leave of absence to return to his previous task and work content, if he is senior to a person performing the task at that time.

*By the Court.*—Judgments reversed, and cause remanded for enforcement of board orders dated April 11, 1962.

CURRIE, C. J. (*concurring in part, dissenting in part*). I concur in all parts of the court's opinion except Part 3, "Downtime," but respectfully dissent with respect to that portion of the opinion.

The workers involved in the dispute over downtime pay were employed on assembly line 1. On the day in question, 22 employees were employed on this line. They were compensated on a group incentive basis whereby the total incentive earnings for the day would be divided among the 22.

On the day in question, one order of engines was in process on the line when the second shift started work. When the last engine of this order left the first station the next order

was not ready to be introduced on the line because the crankshafts for that order had not yet been completely processed. As a result, several "pots" went down the line empty, the exact number of which was not determined in the testimony.

The total time the first station was without parts is not precisely known, but the various estimates range between ten and fifteen minutes. It is certain, however, that all the stations were never completely empty, since the first engine of the new order started before the last engine of the old order went off the back of the line.

The downtime the union sought was for the period of time each man stood idle due to the passage of empty pots; the line did not actually stop at any time.

The clause of the collective agreement which W.E.R.B. found the company to have violated in sec. 4 of art. X, which reads as follows:

"Section 4. Downtime will be paid for at base rate. In the event an employee encounters unavoidable delays beyond his control and he brings such delay to the foreman's attention immediately, on such occurrence he shall be allowed downtime for all such delay until job is running properly. This shall not apply in case of shortage of stock or materials. An employee may be assigned any available work while on downtime."

It is first claimed by W.E.R.B. and the union that by reason of this clause the agreement is clear and unambiguous on the point in issue and that the validity of the board's decision is for that reason beyond question.

Sec. 4 of art. X as quoted would clearly come into play in the case of an incentive worker on an individual rate forced to remain idle for any period of time. It would also clearly come into play when a group of incentive workers, considered as one for incentive pay purposes, such as the assembly line 1 in question, were all idle at once. It is sub-

mitted, however, that it cannot apply to a group working as one on a group incentive task *unless the entire group is idle.* While some of the members of the group are working, the entire is achieving paid production—they are, as a group, performing work on an incentive basis.

In this case the line was always running and some work was always being produced. Therefore, during the ten or fifteen minutes for which downtime is being claimed during the day in question all 22 in the group were receiving some incentive pay earnings. If these 22 employees are to be paid downtime at their base rate in addition, they will be receiving more pay than contemplated by sec. 4 which limits downtime to the base rate. It seems clear that the company's contention is correct that the controlling section of the agreement is sec. 1 of art. X rather than sec. 4. Sec. 1 provides:

"The time standards are set to enable the average worker to consistently earn at least twenty percent (20%) over their base rate working at an average incentive pace. The base rate for each respective job classification shall be the only guarantee for each hour worked, except as otherwise in this agreement expressly provided."

So long as there is no shutdown of the line, all 22 employees being on incentive earnings, the only relief the employees are entitled to is in a situation where the employees' incentive rates fall below 120 percent of the base rate. The incentive rate should be set so that delays not resulting in the shutting down of the line are taken into consideration in establishing the rate.

However, viewing the matter most favorably to W.E.R.B. and the union, there is at the most an ambiguity as to whether sec. 1 or sec. 4 is applicable to the instant set of facts. This being the case, past practical construction should govern. The undisputed testimony is to the effect that down-

time was never paid except when the line was entirely shut down. While it is true these witnesses who gave such testimony were not asked the direct question whether there had ever occurred instances in the past when a series of "pots" on the line were empty, the clear implication of such testimony is that this had occurred. Common experience dictates that this must have been so.

The majority W.E.R.B. decision never touched on this issue of practical construction, although federal law applicable to the interpretation of collective-bargaining contracts is to the effect that great weight is to be given to such practical construction. *United Steelworkers v. Warrior & Gulf Navigation Co.* (1960), 363 U. S. 574, 580, 80 Sup. Ct. 1347, 4 L. Ed. (2d) 1409; *Oddie v. Ross Gear & Tool Co.* (6th Cir. 1962), 305 Fed. (2d) 143, 151, certiorari denied (1962), 371 U. S. 941, 83 Sup. Ct. 318, 9 L. Ed. (2d) 275.

For these reasons I would affirm that part of the circuit court's order which reversed that portion of W.E.R.B.'s order which found the company guilty of a violation of contract with respect to the downtime issue.

I am authorized to state that Mr. Justice HALLOWS joins in this opinion.