BOARD OF EDUCATION, BROWN DEER SCHOOLS, SCHOOL
DISTRICT NO. 1, Respondent, v. WISCONSIN EMPLOY-
MENT RELATIONS COMMISSION, Appellant.

Supreme Court

*No. 76–164. Submitted on briefs October 4, 1978.—*
*Decided November 28, 1978.*
(Also reported in 271 N.W.2d 662.)

For the appellant the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *John D. Niemisto,* assistant attorney general.

For the respondent the cause was submitted on the brief of *Michael R. Wherry, Michael L. Roshar* and *Mulcahy & Wherry, S.C.,* of Milwaukee.

WILLIAM G. CALLOW, J. This is an appeal from a judgment reversing a Wisconsin Employment Relations Commission (hereinafter Commission) order which directed the reinstatement of a discharged school teacher upon certain conditions. The issue is whether the Commission could reasonably find that the tenured teacher's

letter on August 17, 1972, requesting a leave of absence and stating a desire to return to teaching the following year, satisfied a contractual requirement that teachers who have been granted a leave notify the superintendent on or before February 1 of their intent to return the ensuing year.

Robert Diekroeger was employed as a teacher for the Brown Deer School District No. 1 commencing in September, 1958. He became tenured and was department chairman of the Business Education Department at the high school. During the 1971–1972 school year, Diekroeger's alcoholism began to interfere with his job performance. He was scheduled to teach during the 1972 summer session but failed to report for work and was replaced. Because of this, Dr. Raymond Waier, the superintendent of schools, attempted to contact Diekroeger. On August 2, 1972, Diekroeger failed to keep an appointment with Waier, though they did talk by phone and agree to meet August 7. By letter of August 2, Waier suggested that Diekroeger request a one-year leave of absence for health reasons as an alternative to Waier's recommending Diekroeger's dismissal to the Brown Deer Board of Education (hereinafter the Board). After Diekroeger missed the August 7 appointment, Waier informed him by letter that he would recommend termination of his employment and that the unexecuted 1972–73 teaching contract which Diekroeger had not returned was deemed null and void. Diekroeger returned his unsigned contract by mail on August 8. On August 17 Diekroeger wrote Waier a letter requesting a one-year leave of absence. The letter contained the following paragraphs:

"It certainly has been a pleasure working for this system, and it is my desire that I again have an opportunity to serve in a similar capacity during the following school year.

" . . .
"P.S. I apologize for any inconvenience caused by earlier communications which left these desires questionable."

Waier replied by letter of August 23, 1972, stating that he considered the return of the unexecuted contract a resignation and that he would recommend to the Board that the leave request be denied. The Board denied the request for leave, and on September 18, Diekroeger and the Brown Deer Education Association (hereinafter the Union) filed a grievance based on a collective bargaining agreement which became effective August 25, 1972. Dr. Waier denied the grievance on September 19. A hearing was held before the Board in accordance with the contractual grievance procedure on October 2. Waier and Diekroeger testified. The Board denied the grievance but suggested that the parties negotiate a revised leave request for the Board's consideration on October 9.

Immediately after the Board announced its decision on October 2, Diekroeger, his lawyer and union representatives, Waier, two school board members, and the school board attorney negotiated the following leave request:

### "REQUEST FOR LEAVE OF ABSENCE

"I, Robert Diekroeger, hereby request a one (1) year leave of absence for the 1972–73 school year pursuant to Sec. 500.03 of the Contract between School District Number 1, Village of Brown Deer, and the Brown Deer Education Association. It is understood that I shall make arrangements to supply medical progress reports to the Superintendent of Schools on or about January 1, 1973 and on or about August 1, 1973."

The Board granted this request on October 9, 1972.

Sec. 500.03, the general leave of absence provision of the collective bargaining agreement, provides as follows:

"500.03 *LEAVE OF ABSENCE WITHOUT PAY*

"On recommendation of the administration and approval of the School Board, teachers having permanent tenure, who have rendered satisfactory service in the School District, may be granted a leave of absence for study, for teaching abroad, or other good reason, for one semester, or one year, without pay. Requests must be made in writing, and if granted, the teacher will be continued on the salary schedule without loss of tenure or placement eligibility. *Teachers who have been granted a one year leave of absence must notify the Superintendent, in writing, of their intention to return to teaching. Such notification shall occur on or before February 1st to qualify a teacher for a contract during the ensuing year.*" [Emphasis added.]

Diekroeger began an alcoholism treatment program which consisted of administration of the drug Antabuse every second or third day at Ivanhoe Treatment Inc. under the supervision of Dr. Wess Vogt. About December 15, 1972, Diekroeger informed the Ivanhoe administrator, Mrs. Marian Romberger, of his obligation to provide a medical report by January 1. Sometime before January 1, Mrs. Romberger told Diekroeger that Dr. Vogt, the only person who could prepare the report, was leaving for a sabbatical in Europe. She said that Dr. Vogt would return in a month. He was gone about six weeks. Diekroeger testified that in mid-January he informed Waier's secretary over the phone of his problem in providing a report. On January 22 Diekroeger had a phone conversation with Waier concerning the problem, and Waier said that if Diekroeger did not produce a statement in the next three or four days he would bring the matter to the attention of the Board. On January 23, 1973, Mrs. Romberger wrote to Waier, at Diekroeger's request, explaining that Dr. Vogt was gone but would be returning in time to dictate a letter within a week or ten days. The Vogt letter was not written

until February 23. It expressed Dr. Vogt's opinion that, if Diekroeger continued to cooperate in the program, "he could effectively function as a good teacher during the 1973–1974 school year."

By letter of February 15, 1973, Waier notified Diekroeger that his services would be terminated for failure to timely supply a medical report and give notice of an intent to return to teaching before February 1. The Board terminated Diekroeger's services on March 16 for the two reasons announced in Waier's letter of February 15, and it subsequently denied Diekroeger's grievance which was filed following the dismissal. The collective bargaining agreement contained no provision for arbitration.

On July 23, 1973, Diekroeger and the Union filed a prohibited practices complaint with the Commission alleging among other things that Diekroeger's termination was without good cause. Sec. 100.02 (2) of the collective bargaining agreement provided that the Board retained the authority to terminate teachers for good cause. Sec. 100.02 (3) of the collective bargaining agreement further stated that the Board shall act in conformance with state law. Sec. 118.23 (3), Stats., generally provides that a tenured teacher may be discharged only for "good cause." Sec. 111.70 (3), Stats., makes it a prohibited practice for a municipal employer to violate a collective bargaining agreement in certain respects. The Commission thus acquired jurisdiction over the controversy. Secs. 111.70 (4) (a) and 111.07.

In accordance with the leave agreement, Diekroeger had Dr. Vogt write Waier a letter on July 31 confirming his medical progress.

Hearings were held before an examiner on August 10 and 27, 1973. On July 3, 1974, the examiner issued findings of fact, conclusions of law, and an order accompanied by a memorandum. The order directed Die-

kroeger's reinstatement with back pay offset by interim earnings, contingent upon Diekroeger's submission of a report certifying him to be medically fit to assume teaching. The examiner's findings included the following:

"18. That Complainant complied with the notice requirement in Sec. 500.03 of the Agreement in that he notified the Superintendent in writing before February 1, 1973, and specifically on August 17, 1972, of his intent to return to teach for Respondent in school year 1973–74.

"19. That Complainant Diekroeger substantially, and therefore, sufficiently, complied with the requirement that he make arrangements to supply the Superintendent with medical progress reports on or about January 1, 1973 and on or about August 1, 1973 because the delay of the Superintendent's receipt of the first such report caused Respondent no detriment, such delay was not attributable to deliberate conduct or bad faith on Diekroeger's part; that, therefore, said delay did not relieve Respondent of its obligation to employ Diekroeger as a teacher in the 1973–74 school year; and that, therefore, Respondent's dismissal of Diekroeger on March 15, 1973 was without good cause."

On July 16, 1974, Dr. Vogt wrote a letter expressing his opinion that Diekroeger was able to function as a teacher. On July 29, 1974, the Board sought review of the examiner's findings, conclusions, and order by the Commission. On July 25, 1975, the Commission affirmed the examiner's findings and conclusions and enlarged the order to extend to the ensuing school year. On August 22, 1975, Diekroeger furnished letters of medical certification as required by the order.

The Board petitioned for judicial review of the Commission's order pursuant to secs. 111.07 (8), 227.16–227.-20, Stats. The Commission counter-petitioned for enforcement of the order pursuant to sec. 111.07 (7). On July 14, 1976, the court issue a memorandum decision sustaining Finding 19 as to Diekroeger's compliance with the

requirement of furnishing medical reports but determining that Finding 18 as to Diekroeger's compliance with the notice requirement under the collective bargaining agreement was unsupported by the evidence under secs. 111.07(7), 111.07(8), and 227.20(1)(d), Stats. 1973. The court's reasoning is set forth in these paragraphs from its decision:

"The Examiner's finding of fact that the Diekroeger letter of August 17, 1972 (exhibit No. 30) met the requirements of the October 1972 agreement (exhibit No. 7) approved by the Board October 9, 1972; that, Diekroeger was granted a one-year leave of absence for the 1972–73 school year pursuant to Sec. 500.03 of the contract between School District No. 1 The Village of Brown Deer in [sic] the Brown Deer Education Association just cannot hold evidentiary water in light of his previous findings of fact that the school Board rejected that request on two separate occasions; namely, September 8, 1972 and then again on October 2, 1972.
"  . . .
"This court is of the opinion that the law will not support the Examiner's findings of fact in paragraph 18, in that the agreement reached by Diekroeger and unanimously approved by the School Board October 9, 1972, precluded any employment of any negotiations and conversations leading up to and including the making of a written agreement to vary its terms.
"  . . .
"The plain and clear terms of the agreement (exhibit 7) signed by Diekroeger and unanimously approved by the School Board required that as of October 9, 1972, Diekroeger, pursuant to Sec. 500.03 of the collective bargaining agreement, give written notice of his intention to return to teaching for the 1973 and 1974 school year to the superintendent by February 1, 1973. He didn't give such written notice by February 1, 1973. Since he didn't comply with the plain and clear terms of exhibit 7, the School Board was under no obligation to hold open a teaching position for him for the 1973 and 1974 school year.
"The WERC, in affirming the 18th finding of fact of the Examiner, literally rewrote the agreement (exhibit

7) between Diekroeger and the School Board. They, just as a court of law, have no such prerogative."

Judgment reversing the Commission's order was entered July 30, 1976. The Commission appeals.

The initial question is the standard of review to be applied to the Commission's finding. The circuit court viewed the determination as one of fact and concluded that under either the "substantial evidence" test prescribed by secs. 111.07(8) and 227.20(1)(d), Stats. 1973, for judicial review proceedings or the "credible and competent evidence" test prescribed by sec. 111.07(7), Stats. 1973, for enforcement proceedings, the Commission's findings could not be sustained. While the determination of compliance with the contractual provision is denominated a "finding of fact," that label is not conclusive, though it may be significant, as to whether the substance of the statement will be judicially reviewed as a finding of fact or a conclusion of law. *Pabst v. Department of Taxation,* 19 Wis.2d 313, 322, 120 N.W.2d 77 (1963).

The evidentiary facts are undisputed: Diekroeger informed Waier of his desire to teach in the year following his requested leave; he gave no actual written notice to Waier of such an intention after the leave was granted. This presents the question of the effect of these undisputed facts under the provisions of the collective bargaining agreement as incorporated into Diekroeger's approved leave request.

In *Tecumseh Products Co. v. Wisconsin Employment Relations Board,* 23 Wis.2d 118, 126 N.W.2d 520 (1964), we reversed a circuit court judgment overturning a decision of the Employment Relations Board[1] which determined that the company violated the terms of the collec-

---

[1] The "Board" became the "Commission" by virtue of Chapter 296, Laws of 1967.

tive bargaining agreement in two respects. We stated the standard of review appropriate to an agency decision construing and applying terms in a collective bargaining agreement as follows:

"To resolve disputes such as these, the board must apply certain standards, either expressly stated in the agreement or derived from the board's knowledge of industrial relations, if the agreement is silent, to certain determined facts. The application of a standard to certain facts to dispose of a dispute involves a conclusion of law. *Milwaukee Transformer Co. v. Industrial Comm.* (decided February 4, 1964), 22 Wis.(2d) 502, 126 N.W. (2d) 6. This court, however, will not independently redetermine every legal conclusion of the board. If the board's construction of the agreement is reasonable, this court will sustain the board's view, even though an alternative view may be equally reasonable. *Milwaukee Transformer Co. v. Industrial Comm., supra.* The reasonableness of the board's determination will be assessed not only from the point of view of the express criteria for judgment set forth in the agreement, but, because the express standards of the agreement are often purposefully general and indeterminate, the board's determination must also be evaluated in terms of the 'common law of the shop'—general practices and principles of industrial relations which are part of the context in which every collective agreement is negotiated, although not expressed in the contract as criteria for judgment." 23 Wis.2d at 129–30.

Thus this court has viewed as a question of law the application of a collective bargaining agreement to certain facts. The question on review is whether the Commission's construction was reasonable in light of the language of the instrument and its industrial context. The specific issue presented here is whether the Commission could reasonably find that Diekroeger's letter of August 17, 1972, expresing his desire to return to teaching after a year's leave of absence, satisfied the contrac-

tual requirement that teachers who have been granted a leave under sec. 500.03 of the collective bargaining agreement give written notice by February 1 to the superintendent of their intent to return the following year.

In this case the Commission's construction of the terms of the agreement as applied to these facts is clearly stated in the examiner's memorandum accompanying his findings, conclusions, and order. The memorandum stated:

"The Examiner also concludes, however, that Diekroeger's August 17 written notification to the Superintendent of his intent to return to teaching for Respondent in school year 1973–74 satisfied the Sec. 500.03 requirement. Respondent contends that such notice was made ineffective by the fact that it was submitted prior-in-time to the parties' settlement agreement that granted the leave of absence. But the parties' settlement agreement did not consist of a single document integrating all prior negotiations. Even if it had, the August 17 letter contained two separate and independent messages to the Superintendent. The first, a part of the negotiating history of the parties' later agreement, was a request for a one-year leave of absence for school year 1972–73. The second was an unequivocal and unconditional expression of Diekroeger's intent to return to teaching for Respondent in the school year following such leave, i.e., 1973–74. The latter expression would not constitute a part of the negotiating history of the parties' settlement agreement. It is true that the notice requirement in Sec. 500.03 is addressed to 'teachers who have been granted a one year leave of absence.' Nevertheless, the Examiner concludes that the parties intended that language simply to identify the *group of teachers subject to the notice requirement* and that they expressed their entire agreement as to the *time for submission* in the following sentence as '. . . on or before February 1 . . .'

"Diekroeger's August 17, 1972 expression of intent to return to teaching in 1973–74 may have been forgotten by the Superintendent by February 15, 1973 due to the intervening passage of time. Nevertheless, it is not inequitable to give effect to that notice since Diekroeger

did not by word or conduct unequivocally indicate a contrary intent during the intervening months, and he implicitly reaffirmed his intent to return when he informed the Superintendent by phone of his frustrated attempts to arrange for the submission of the first medical progress report." [Emphasis in original.]

■

The circuit court found that the terms of the leave request, as approved, required Diekroeger to give written notice after the approval of the request. This construction is premised on the proposition that the terms of the approved request cannot be varied by consideration of the negotiations preceding it. The examiner's reasoning expressly rejected this construction by viewing the August 17 letter as containing two "separate and independent messages": first, a request for a leave, which became part of the negotiating history; second, an expression of intent to return to teaching the year following the leave. While the court's construction may have been reasonable, it cannot be said that the Commission's determination was an unreasonable construction of the language of the agreement under the circumstances. The Commission's interpretation preserves the Board's legitimate interest in knowing which teachers will return. Early staff planning may be enhanced where a teacher's intention to return is communicated at the time of the filing of the application for a leave.

The Board maintains that the Commission's interpretation is particularly unreasonable in this case because Diekroeger's conduct manifested an ambivalence concerning his desire to return. The facts simply do not support the assertion that Diekroeger was ambivalent. Diekroeger talked to Waier and his secretary in January, 1973, to explain the reason for the delayed reports. He had Mrs. Romberger write a letter of explanation to Waier. On the basis of evidence of this conduct the examiner was

entitled to conclude, as he did, that Diekroeger reaffirmed his intent to comply with the leave agreement and return the following fall.

We conclude the Commission's construction of the collective bargaining agreement was reasonable in view of the language of the instrument and the context of its application. We observe finally that this conclusion is consistent with the well-established judicial policy of avoiding a narrow, technical approach to the construction of labor contracts. *Cutler-Hammer, Inc. v. Industrial Commission,* 13 Wis.2d 618, 634, 109 N.W.2d 468 (1961).

*By the Court.*—Judgment reversed and cause remanded with directions to enforce the Commission's order.