WILLIAM WRIGLEY, JR. CO., Petitioner-
Respondent,†

v.

Wisconsin DEPARTMENT OF REVENUE,
Appellant.

Wisconsin DEPARTMENT OF REVENUE, Peti-
tioner-Appellant,

v.

WILLIAM WRIGLEY, JR. CO., Respondent.†

Court of Appeals

*No. 88-2265. Submitted on briefs July 18, 1989.—Decided
December 7, 1989.*

(Also reported in 451 N.W.2d 444.)

† Petition to review granted.

For the appellant the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *F. Thomas Creeron,* assistant attorney general.

For the respondent the cause was submitted on the briefs of *Barbara J. Janaszek* and *Thomas E. Lange* of *Whyte & Hirschboeck S.C.* of Milwaukee and *H. Randolph Williams* of *Baker & McKenzie* of Chicago, Ill.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J. The Wisconsin Department of Revenue appeals from an order reversing a decision of the Tax Appeals Commission. The commission upheld a franchise tax assessment against the William Wrigley, Jr., Company, an Illinois manufacturer of chewing gum which markets its products in Wisconsin and other states. The department assessed taxes and delinquent interest for the years 1973 through 1978, and Wrigley appealed to the commission on grounds that the assessment was prohibited by federal law. The commission upheld the assessment, but ruled that the department had applied an improper rate of interest. On review, the circuit court reversed and the department appealed.

The issues are: (1) whether the assessment is barred by the provisions of 15 U.S.C. sec. 381 (1988), allowing state taxation of income from interstate commerce only if the company's business activity within the state exceeds the "solicitation of [sales] orders"; and (2) if not, whether the assessed taxes were "delinquent" within the meaning of sec. 71.10(9), Stats. (1985–86), so as to justify application of an eighteen percent (1.5 percent per month) interest rate on the balance due. The trial court, voiding the assessment, did not reach the question of the proper interest rate. An ancillary issue concerns the scope of our review—whether we owe any deference to the commission's interpretation of a federal law.

We conclude that while we owe no deference to the commission in this instance, it nonetheless correctly determined that the assessment was not barred by federal law. We also conclude that the department applied the correct rate of interest. We therefore reverse the order of the trial court and remand with directions to enter an order affirming the commission's decision on

the validity of the assessment and reversing its determination on the appropriate rate of interest to be applied to the assessment.

## I. SCOPE OF REVIEW

The parties agree, as did the trial court, that the primary issue is the interpretation of 15 U.S.C. sec. 381—particularly the scope and meaning of the term "solicitation of orders."

We employ different standards for reviewing the findings of fact and conclusions of law of administrative agencies. The agency's factual findings will be upheld if supported by substantial evidence in the record. Sec. 227.57(6), Stats. The construction of a statute, however, is a question of law. Generally, we decide such questions independently, owing no deference to the trial court or administrative tribunal. *In Interest of C.A.K.*, 147 Wis. 2d 713, 715, 433 N.W.2d 298, 299 (Ct. App. 1988).

Exceptions are made, however, for administrative agencies' interpretations of statutes they are charged by law to administer and enforce. In such situations the agency's interpretation of the statute is entitled to great weight if it reflects a practice or position long continued, substantially uniform and without challenge by governmental authorities and courts. *School Dist. of Drummond v. WERC*, 121 Wis. 2d 126, 132–33, 358 N.W.2d 285, 288–89 (1984). Where this is the case, we will sustain the agency's interpretation if it has any rational basis. *Id.* at 132–33, 358 N.W.2d at 288.

Even where the higher "great weight" standard of deference is inapplicable, courts will accord "due defer-

ence" to an agency's application of the law to found facts when the agency has particular competence or expertise in the matter at hand, *Dept. of Revenue v. Milwaukee Refining Corp.,* 80 Wis. 2d 44, 48, 257 N.W.2d 855, 857 (1977), or where the decision is intertwined with value and policy judgments appropriate to the agency's administration of the underlying law. *Transp. Dept. v. Transp. Com'r,* 135 Wis. 2d 195, 199, 400 N.W.2d 15, 16 (Ct. App. 1986). But no such deference is required where the courts are as competent as the agency to decide the question presented. *Milwaukee Refining Corp.,* 80 Wis. 2d at 48, 257 N.W.2d at 858.

Under more usual circumstances, we would accord some deference to the commission's decision in this case, based as it is on the interpretation of a law in a field in which it has expertise. Here, however, the statute subject to interpretation is an act of Congress, not a law created by the Wisconsin Legislature. Like all administrative agencies, the commission was created, structured and empowered by the legislature for the primary purpose of "determin[ing] . . . all questions of law and fact arising under [specified provisions of the Wisconsin Statutes]." Sec. 73.01(4)(a), Stats. But whatever deference may be appropriate to the interpretation of particular sections of the Wisconsin Statutes by an agency created by the Wisconsin Legislature to do just that, we fail to see how or why similar deference should be accorded to the agency's interpretation of federal law.

The department responds with a brief reference to two cases, both cited for the proposition that deference must be paid in such a situation: *Tecumseh Products Co. v. Wisconsin E.R. Board,* 23 Wis. 2d 118, 127-29, 126 N.W.2d 520, 524-25 (1964), and *Milwaukee v. ILHR Department,* 106 Wis. 2d 254, 257-59, 316 N.W.2d 367, 369-70 (1982). We do not read either case as so holding.

*Tecumseh Products* involved the Wisconsin Employment Relations Board's interpretation of the word "job" in a collective bargaining agreement, and the court appropriately paid deference to the board's expertise in construing such agreements. The *Tecumseh Products* court's reference to "federal law" had nothing to do with the scope of review of the agency's interpretation. It was simply a statement in another section of the opinion that the board "ha[d] jurisdiction to apply federal common law of collective-bargaining agreements in resolution of disputes under [Wisconsin Statutes]." *Id.,* 23 Wis. 2d at 129, 126 N.W.2d at 525.

The reference to *Milwaukee v. ILHR Dept.,* is similarly unavailing, for there the court's reference to the deference to be accorded the agency's interpretation referred to its interpretation of a Wisconsin statute. *Id.,* 106 Wis. 2d at 257, 316 N.W.2d at 369. The reference to "federal law" was included only to illustrate the statute's conformity with federal statutes. *Id.,* 106 Wis. 2d at 259, 316 N.W.2d at 370.

We conclude, therefore, that whatever deference we may owe to a state agency's expertise and function when it interprets acts of the Wisconsin Legislature, no such deference is owed when the agency is interpreting statutes or rules of the federal government.

## II. 15 U.S.C. SEC. 381 AS A BAR TO THE ASSESSMENT

The commission, after discussing the facts of Wrigley's business activities within the state, concluded that 15 U.S.C. sec. 381 did not prohibit assessment of Wisconsin franchise taxes to the company because its Wisconsin activities comprised more than the mere "solici-

tation of orders" within the meaning of the law. In so deciding, it adopted and applied a set of guidelines prepared by the Multistate Tax Commission (MTC), an association of state revenue officials, to the facts of Wrigley's activities in Wisconsin. The parties spend considerable time arguing the propriety of the commission's use of such extralegal "guidelines" as the benchmark for its decision here. While we share Wrigley's concern that the commission may have exceeded its authority by doing so, because we review its conclusions *de novo* we need not decide the propriety of its use of the MTC materials.

It is generally accepted that 15 U.S.C. sec. 381 was enacted in response to the decision of the United States Supreme Court in *Northwestern Cement Co. v. Minn.,* 358 U.S. 450 (1959), and its denial of certiorari in *Brown-Forman Distill. Corp. v. Collector of Revenue,* 101 So. 2d 70 (La. 1958), *cert. denied,* 359 U.S. 28 (1959).

In those cases the Court upheld state taxation of the income of multistate businesses with little activity in the taxing states other than the presence of sales offices (*Northwestern*) and so-called "missionary men" who solicited local wholesalers and sometimes assisted them in obtaining product display paraphernalia for use in retail stores (*Brown-Forman*). According to reports accompanying the bill that became 15 U.S.C. sec. 381, these decisions led to "serious apprehension" in the commercial community that mere solicitation activities by multistate businesses would subject them to multiple state taxation. *U.S. Tobacco Co. v. Com.,* 386 A.2d 471, 474 (Pa. 1978), *cert. denied,* 439 U.S. 880 (1978), citing S. Rep. No. 658, 86th Cong., 1st Sess. 2, *reprinted in* 1959 U.S. Code Cong. & Admin. News 2548. Thus, 15 U.S.C. sec. 381 was the congressional response to *North-*

*western* and *Brown-Forman*—a law passed to "allay the fear that 'mere solicitation' would subject interstate businesses to multiple state taxation." *Tobacco Co.,* 386 A.2d at 474.

Courts in other jurisdictions considering the language of 15 U.S.C. sec. 381 have varied in their interpretations of the "solicitation" provisions of the law. The narrowest view, that obtaining in New Jersey and Arkansas, among other states, is that "solicitation of business" must be strictly limited to the specific task of asking a customer to purchase one's product. *Clairol, Incorporated v. Kingsley,* 262 A.2d 213, 217-18 (N.J. Super. Ct. App. Div. 1970), *aff'd,* 270 A.2d 702 (N.J. 1970), *appeal dismissed,* 402 U.S. 902 (1971). Under this view, the taxpayer must "bring itself within the statute [by showing] that the *only* business activity on its behalf in [the taxing state] was the solicitation of orders [for sales of tangible personal property]." *Hervey v. AMF Beaird, Inc.,* 464 S.W.2d 557, 561-62 (Ark. 1971) (emphasis in original).

A slightly more liberal view—really a middle ground—is that held by, among others, the Oregon court: that is, that "solicitation" also includes those generally accepted or customary acts in the industry which lead to the placing of orders. *Miles Laboratories, Inc. v. Department of Revenue,* 546 P.2d 1081, 1083 (Or. 1976).

The broadest position finds favor in Pennsylvania and New York. The Pennsylvania Supreme Court, in *Tobacco Co.,* 386 A.2d at 478, held that permissible "solicitation" under 15 U.S.C. sec. 381 included "sundry activities so long as those activities [are] closely related to the eventual sale of a product"—activities that are "incident to soliciting," whether they lead up to the sale or follow it.

Our reading of 15 U.S.C. sec. 381 in light of the facts underlying its enactment and the views of state courts that have considered it leads us to conclude that it was intended, in the words of *Miles Laboratories,* to exempt not only the actual solicitation of orders as that term is commonly understood, but also those acts which, according to custom and practice in the particular industry, are those that lead to the placing of orders by customers. We agree with the Pennsylvania Supreme Court that, while the Senate Report supports a relatively narrow construction of the term "solicitation," it must reasonably include activities beyond a simple sales pitch—something more than merely "send[ing] salespeople into another state who leave brochures describing their employer's products, hoping the prospective customer will then take the initiative to contact the employer for possible sale." *Tobacco Co.,* 386 A.2d at 478. The concept must include other activities so long as they are closely or "inextricably" related to the eventual sale of the product. *Id.* Thus, presale activities such as "visiting retail outlets, introducing new products, and advising retailers on making attractive displays of . . . products" should not, by themselves, subject the company to taxation. *Id.*

However, we do not believe that "solicitation of orders" should encompass post-sale activities that are not closely or "inextricably related" to the solicitation of orders. Thus, it should not include those acts which follow as a natural result of the transaction, such as collections, servicing complaints, technical assistance and training, and similar activities. *Miles Laboratories,* 546 P.2d at 1083.

The application of 15 U.S.C. sec. 381 to a particular interstate business is, of necessity, a case-by-case determination based on the facts establishing the

"nexus"—or lack of it—between the company's activities and the taxing state.

In the opinion accompanying its order, the commission determined that Wrigley employees carried on the following "non-immune" activities within the State of Wisconsin during the years in question: (1) replacing stale gum; (2) maintaining product displays both as to location, design and content; (3) direct sales of gum through "agency stock checks"; (4) maintaining offices in home; (5) conducting regular and periodic training seminars; (6) recommending hiring, firing and salary increases for sales representatives; (7) involvement in credit transactions;[1] (8) training and supervision of sales representatives; (9) rental of storage space; and (10) purchase of "non-incidental" advertising in Wisconsin. The commission concluded that, taken together, these were "considerable activities" within the state which "transcended the solicitation of orders protected by [15 U.S.C. sec. 381]."

Examining the commission's findings, the circuit court concluded that there was no evidence that "regular and periodic" training seminars were held in Wisconsin. The court then discussed "qualif[ying]" evidence relating to several of the remaining findings and concluded that

---

[1]When the case was initially appealed to the circuit court, the court noted that the commission's finding regarding regional sales managers' participation in credit decisions was unclear. On remand, the commission clarified the finding. In the years in question—1973 through 1978—Wrigley had two different managers for Wisconsin, one from 1973 to 1975, and another from 1976 on. The commission, noting that the company's job description for the position called for the regional manager's participation in credit transactions, stated that only the 1973–75 manager did so, and, further, that its decision was not grounded on that fact alone, but on the "totality" of the company's activities.

none of the company's activities went beyond those that are "necessarily incident to the efficient practice of soliciting orders in fields remote from headquarters," and thus did not transcend "solicitation," as that term is used in 15 U.S.C. sec. 381. Wrigley advances the same position on appeal—that the commission's findings lack evidentiary support.

As we have said, we review the commission's decision independently, owing no deference to the trial court's determination. And while the trial court's decision in this case was thoughtful, thorough and well-reasoned, we take a different view of the evidence. Our own reading of the record leads us to conclude that there is substantial evidence to support the commission's order.

The substantial evidence rule is not a preponderance-of-the-evidence test, but an inquiry into whether reasonable minds could arrive at the same conclusion reached by the commission. *Farmers Mill of Athens, Inc. v. ILHR Dept.,* 97 Wis. 2d 576, 579, 294 N.W.2d 39, 41 (Ct. App. 1980). The fact that the evidence is in conflict is not grounds for reversal, for it is the commission's function, not ours, to weigh and determine the credibility of, and to draw inferences from, the evidence. *Id.* at 580, 294 N.W.2d at 41. We note also that, when one or more inferences reasonably may be drawn from the evidence, the choice of inferences is an act of fact-finding, and the inference drawn by the agency is conclusive. *Id.* And when we review an agency's decision, just as when we review a trial court's decision, our task is to search for evidence to support that decision, not for evidence which would support a different or contrary result. *Hawes v. Germantown Mutual Ins. Co.,* 103 Wis. 2d 524, 543, 309 N.W.2d 356, 365 (Ct. App. 1981).

Taking the commission's findings *seriatim,* we believe there is ample evidence to support its initial determination that Wrigley's Wisconsin sales representatives maintained product displays and replaced stale or outdated products at various retail outlets throughout the state. Richard Radosevic, a former Wisconsin sales representative, testified that he would carry about $1,000 worth of gum and other products with him on his rounds, along with forty to seventy-five cases of "display racks [and related] equipment." He would check stores' existing supplies of gum for "outdatedness" and would "exchange . . . stale product for fresh products," destroying the stale gum. According to Radosevic, he set up and placed display racks in stores on a "daily" basis.

The commission also found that Wrigley's sales representatives made direct sales of gum to retailers through what was known as "agency stock checks." Radosevic testified that sometimes—perhaps once a month—when he was setting up and placing a display rack for a retailer he would fill the rack with gum and would bill the wholesaler for the products left in the store, and the wholesaler would then bill the retailer. The papers prepared to arrange these billings were known as "agency stock checks."

The evidence in support of the commission's findings that Wrigley personnel conducted "regular and periodic training seminars" in Wisconsin and otherwise trained and supervised the field representatives is found in the testimony of the company's district manager, John Kroyer, and that of Gary Hecht, the regional manager. According to Kroyer, each new sales representative was trained "in the field," under the direction of the regional manager, for a period of about four weeks before going out on his or her own. In addition, in the years in question (1973–76) Kroyer "occasionally" conducted

meetings with his Wisconsin "sales force." He stated that in the three-year period such meetings "probably averaged one a year . . .." They were held either in Kroyer's home or in a motel or hotel. He described them as "sales meetings" where the participants discussed "mainly sales strategy . . . how we could get additional volume, how we could improve content merchandising . . . how we could get greater sales." Kroyer would also meet with various sales representatives individually, "generally [in] a coffee shop," to discuss "sales and potential sales and maybe whether we were going in the wrong direction with an account, methods to improve those communications." He testified that one of his responsibilities was to check to see how the sales representatives were performing—how they were "grasping the job," whether they had any "weaknesses," whether they were "taking advantage of merchandising opportunities," and similar matters. He also acknowledged that he was the sales representatives' "immediate supervisor" and that, as such, he "basically determined the[ir] day-to-day activities."

Hecht testified that it was his practice to conduct day-long group meetings with Wisconsin representatives once or twice a year, usually in a hotel. The purpose of the meetings, according to Hecht, was to "communicate" with the representatives on the company's "major thrust[s] or objective[s] such as the introduction of a new brand or a new packaging . . .." Hecht also described his supervision of the sales representatives, including "periodic" evaluations of their sales presentations and other aspects of their work, assigning specific duties to them, re-drawing sales territories and similar activities. In addition, Richard Radosevic, in his capacity as one of Wrigley's "key account sales managers" attended at least

one meeting of Wisconsin sales representatives in order to "go over various company goals and objectives."

The finding that Wrigley's Wisconsin managers recommended the hiring, firing and salary increases for sales representatives is also supported by the testimony of John Kroyer. Kroyer acknowledged that he had "hired" at least one field representative during his three-year term as Wrigley's regional manager in Wisconsin. While he stated that he did not have the "final say" in hirings, he acknowledged that when a vacancy occurred, he "handled the process of locating an applicant and interviewing him." He would then make the "final selection" and communicate his "recommendation" to the company's district manager in Chicago for approval. Kroyer also described how he once "fired" a sales representative—calling it "a rather spontaneous on the spot dismissal," although he again stated that the "ultimate decision [resided] with the district manager." When asked about his own role in the process, however, Kroyer said simply: "I terminated him [for poor job performance.]" He stated that before he did so he had told his supervisor that "if I found what I thought I'd find" in investigating the representative's performance, "I was going to dismiss [the employee], and he [the manager] agreed." Finally, Kroyer acknowledged that he would make recommendations for pay raises for sales representatives under his direction. Here, too, Kroyer's superior, the district manager, had the final "say" in the matter.

The commission also found that Wrigley's Wisconsin personnel had been "involved" in customer credit matters. This finding also has support in the record. Kroyer testified that, in his capacity as regional manager, he would occasionally "get involved" with "credit problems" involving Wisconsin accounts. Wrigley's Chi-

cago office would provide Kroyer and other regional managers with copies of letters sent to customers with credit problems in the various managers' territories. When Kroyer felt that the company was getting "nasty" with a good account in his area, he would "intercede" in the matter in an attempt to resolve the dispute. Sometimes Kroyer would "take [disputes] to [Wrigley's] credit department on behalf of the account to see if we couldn't get some shipments made." He stated that he saw his job as being "kind of a mediator" in such situations, and that he would engage in these activities "probably a couple, three times a year."

There was also evidence supporting the commission's finding that, on one occasion at least, Wrigley rented storage space in Wisconsin. When Kroyer terminated an employee in 1973, he rented space in a Madison warehouse to store the company car, cases of gum, display materials and similar goods. He was reimbursed by Wrigley for the rental expenses. When the replacement was hired, the new person continued to rent the warehouse space and the lease was still in effect three years later when Kroyer left the area to take another position. Finally, we note extensive discussion in the record relating to Wrigley's advertising efforts, both in Wisconsin and elsewhere, including Wisconsin ads on radio, television and "coupon" ads in state newspapers.[2]

In addition, there was evidence that Kroyer maintained an office in his home in Wisconsin, using at least some company-furnished equipment. He was not reimbursed for any office expenses other than the telephone

---

[2]The department does not explain how such advertising exceeds the "solicitation of orders" limitation in 15 U.S.C. sec. 381, and we do not rely on it on this appeal. Even without such a finding, there is ample evidence to support the commission's ultimate determination.

bills, but he did take a home/office deduction on his income taxes. He maintained the office to aid him in "coordinat[ing] the sales activities and keep[ing] my thumb on top of all regional activities."

There is, as we have said, other evidence which may be read to contradict some of the testimony referred to above. But, as we have also said, our task is not to look for evidence to support a decision the agency could have, but did not, make—nor even to weigh the evidence; it is simply to determine whether there is substantial evidence to support the decision made. The testimony just discussed leads us to answer that question in the affirmative.

The inquiry then becomes whether the found facts support the conclusion that Wrigley's Wisconsin activities go beyond the solicitation of orders, as that term appears in 15 U.S.C. sec. 381, and as we have interpreted it in this opinion. Again, we believe that they do. While the rental of space and the intervention in credit matters may not have been regular duties of Wisconsin representatives, the warehouse rental continued for a period of years and Kroyer's self-described "involve[ment]" in matters relating to customer credit occurred on at least a semi-regular basis—at least two or three times a year. So, too, the setting up of displays, by itself, would not and should not subject Wrigley to state taxation. These activities, however, must be considered in light of the other evidence of Wrigley's "presence" in Wisconsin, which the testimony indicated were many and varied. In addition to those just mentioned, Wrigley personnel were engaged in: conducting both "occasional" and semi-annual sales meetings; operating month-long field training programs for new employees; providing representatives with individual $1,000 product inventories, some of which would be used by the representatives to stock

store display racks on a regular basis, whereupon the retailer would be billed through an "agency stock check" procedure; and maintaining direct supervisory control over individual representatives, which included not only the representatives' daily work, but also most of the hiring, firing and salary-setting activities.

The peculiar facts of this case, then, lead us to conclude that Wrigley was engaged in something more than the solicitation of orders in the State of Wisconsin in the years in question, for they include acts that go beyond those that are inextricably related to such solicitation and generally considered to lead to, rather than follow, the placing of orders. Wrigley's Wisconsin employees were not just "missionaries." They were hirers, firers, meeting organizers, trainers, customer credit "intervenors" or "mediators," renters of warehouse space, stale product replacers, inventory-carriers, display stockers, sellers and billers. We conclude that 15 U.S.C. sec. 381 did not bar the State of Wisconsin from subjecting Wrigley to its franchise tax.

### III. THE INTEREST PENALTY

The Department of Revenue imposed interest of 1.5 percent per month on the taxes assessed to Wrigley. The percentage is that applicable to "delinquent" income and franchise taxes under sec. 71.13(1)(a), Stats. (1985–86), which provides that "[i]ncome and franchise taxes shall become delinquent if not paid when due . . . and when delinquent shall be subject to interest at the rate of 1.5% per month until paid . . .."

The commission disagreed, holding instead that sec. 71.13(2), Stats. (1985–86), applied. That section states that "[a]ny *additional* income or franchise *tax assess-*

*ment* contested before the tax appeals commission or in the courts, which is finally determined to be correct, shall become delinquent if not paid on or before the 30th day following the date on which the order or judgment representing such final determination becomes final and conclusive." (Emphasis added.)

Concluding that the assessment represented "additional taxes" which could not become "delinquent" until at least thirty days after a final decision in Wrigley's action contesting the tax—the commission ruled that the so-called "penalty" interest provisions of sec. 71.13(1)(a), Stats. (1985–86), were inapplicable, and that interest could not exceed the legal rate.

The department, pointing to sec. 71.10(9)(a), Stats. (1985–86), which states that corporate income and franchise taxes are "deemed delinquent" if not paid on or before the fifteenth day of the third month following the close of the income year, contends that Wrigley's taxes were in fact delinquent and that the penalty interest rate is thus appropriate.

We agree with the department, and we find the reasoning of dissenting Commissioner Junceau to be particularly persuasive on whether this was an "additional assessment" within the meaning of sec. 71.13(2), Stats. (1985–86). Wrigley had never reported or paid franchise tax in any of the years under review. The assessment came as a result of a field audit conducted by the department "for the purpose of making a determination of the [company's] taxable income . . .." Sec. 71.11(20)(b), Stats. (1985–86). Under sec. 71.11(20)(c), if the audit reveals "that no assessment has been made when one should have been made, the department shall make a correct assessment . . .." Thus, the statutes under which the assessment was made contemplate an initial, rather than an "additional" assessment. The latter term must,

as Commissioner Junceau suggests, "assume[ ] the filing of a return and self-assessment or some other previous assessment."

■■■

We have some sympathy with Wrigley's position that where, as here, a taxpayer believes it owes no tax and thus files no returns, and it is later determined after extensive agency and judicial proceedings that taxes were in fact due in the years in question, it makes sense to treat the due date for penalty purposes as some time after the final court determination of liability. But the legislature has plainly spoken in secs. 71.13(1)(a) and 71.10(9)(a), Stats. (1985–86). Under the latter, a tax is delinquent if not paid by the stated due date; and under the former, delinquent taxes are subject to interest at the rate of 1.5 percent per month. We see no room in the statutory language for the result sought by Wrigley. The department correctly applied the applicable statutes in its imposition of statutory interest on Wrigley's assessment.

*By the Court.*—Order reversed and cause remanded with directions to enter an order affirming the decision of the Wisconsin Tax Appeals Commission insofar as it upheld the franchise tax assessment and reversing the decision insofar as it authorized imposition of interest on the assessment at a rate lower than 1.5 percent per month.

DYKMAN, J. (*dissenting*). It is undisputed that 15 U.S.C. sec. 381 (1988) was enacted to overturn *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450 (1959), and to dispel the "serious apprehension" about that case. It is also undisputed that Congress intended to exempt not only solicitation, but "also those acts which, according to custom and practice in the par-

ticular industry, are those that lead to the placing of orders by customers" Maj. op. at 569. Therefore, the majority should have analyzed this case in the context of the manner by which the chewing gum industry sells its product. Instead, the majority adds up acts that it concludes make a list long enough to take Wrigley out from the protection of 15 U.S.C. sec. 381.

The circuit court focused on the way chewing gum is sold. Eighty-five to ninety percent of Wrigley's sales managers' time is spent soliciting. Over ninety percent of Wrigley's sales are "impulse sales." Thus, a customer's observation of a Wrigley product must create the desire to purchase, or the business activity fails. If the customer, when observing a Wrigley display, recalls a taste of stale gum, or if the display is sloppy, dirty, or unattractive in any way, the sale may not occur. The display must contain the customer's preferred flavor. It is not surprising therefore, that a Wrigley's sales manager does whatever necessary to maintain an attractive display. His or her activities in relation to that display are therefore without a doubt for the purpose of "inducing customers to place orders."

Of course, the sales managers did not tend to the displays in a vacuum. When Pennsylvania focused on the use of a company car as evidence that sales managers were doing more than "mere solicitation" the court replied, "Congress could hardly have intended to exempt only walking solicitors." *United States Tobacco Co. v. Commonwealth,* 386 A.2d 471, 478 (Pa.), *cert. denied,* 439 U.S. 880 (1978).

Congress could have hardly intended to exempt solicitors without records or a place to keep them, or to make exemption dependent upon whether solicitors met on occasion to compare notes or hear of the latest fad in consumer taste. With eighty-five to ninety percent of a

580

sales representative's time spent soliciting, and some time devoted to record keeping, very little time remained to engage in the list of duties the majority finds dispositive.

I would view these other activities, not by the length of the list, but as the *de minimis* result reached when all are totalled. When I do so, I reach the same result as did the circuit court. I would therefore affirm and not reach the question of whether an interest penalty is applied.