NATIONAL TIRES, INC., APPELLANT, *v.*
LINDLEY, TAX COMMR., APPELLEE.

(Nos. 40699, 40700 and 40701—Decided March 27, 1980.)

*Messrs. Jones, Day, Reavis & Pogue* and *Mr. Hugh Calkins,* for appellant.

*Mr. William J. Brown,* attorney general, for appellee.

PRYATEL, P. J. Appellant, National Tires, Inc., appeals the decision of the Board of Tax Appeals ("board") affirming the order of appellee, Edgar Lindley, Tax Commissioner ("commissioner"), assessing franchise taxes, penalties and interest against appellant for the years 1973 to 1975, pursuant to R. C. 5733.05.

The record discloses that in 1975 the commissioner

amended appellant's franchise tax assessment, based upon net income, for the years 1972 and 1973. Appellant immediately paid the assessments, but filed an application for review and correction of these corporate franchise taxes.[1]

In 1976, the commissioner issued two additional franchise tax assessments, including penalties and interest, covering the years 1974 and 1975. Appellant also paid these assessments promptly and again filed an application for review and correction of such assessments.

Upon consideration of appellant's applications for review and correction of the several years' franchise taxes, the commissioner ordered a refund for the tax paid in 1972, but affirmed the assessments for the years 1973 through 1975. Additionally, he reduced the penalties earlier imposed for these assessments.

Appellant appealed to the board.[2]

The board held a hearing upon the three appeals in 1977. Subsequently, in 1979 the board affirmed the commissioner's decision.

Appellant presents the following sole assignment of error in its appeal to this court[3]:

"The Board of Tax Appeals erred in holding that Ohio could lawfully impose upon appellant Ohio Franchise tax measured by net income for the taxable years 1973 through 1975."

Appellant challenges the commissioner's assessments for the following reasons.

Appellant contends that it is exempt from paying corporate franchise taxes measured by net income, since its business in Ohio consists merely of "solicitation." Under Section 381, Title 15, U.S. Code, a corporation dealing in interstate commerce is immune from such taxes when its activity in another state is limited to "solicitation of orders."

Appellant thus concludes that the commissioner's assessments unduly burden interstate commerce by imposing a dou-

---

[1] The application was filed pursuant to R. C. 5733.11.

[2] The board assigned the following case numbers for each of the assessments appealed: case no. 361-B covers 1973; case no. 361-A covers 1974; case no. 361 covers 1975.

[3] The three consolidated appeals are designated in this court as case nos. 40699 through 40701 for the years 1973 through 1975, respectively.

ble tax (Colorado and Ohio) upon the corporation. As such, appellant contends that it has been denied due process of law.

Public Law 86-272, codified in Section 381, Title 15, U.S. Code, provides in part:

"(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:

"(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

"(2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

"* * *

"(c) For purposes of subsection (a) of this section, a person shall not be considered to have engaged in business activities within a State during any taxable year merely by reason of sales in such State, or the solicitation of orders for sales in such State, of tangible personal property on behalf of such person by one or more independent contractors, or by reason of the maintenance, of an office in such State by one or more independent contractors whose activities on behalf of such person in such State consist solely of making sales, or soliciting orders for sales, of tangible personal property."

Upon review of appellant's business activity in Ohio, the commissioner concluded that:

"The activity engaged in by the applicant within Ohio exceeds the minimum activity threshold under which a state is prohibited from levying a tax on or measured by net income under the provisions of 15 U.S.C. Sec. 381 (P.L. 86-272)."

The record before this court is comprised of the transcript furnished by the Tax Commissioner; the testimony of appel-

lant's Ohio District Manager, Vern Thorn, taken before the board; exhibits presented to the board; and, the briefs supplied by counsel for the parties.

The record discloses the following pertinent information.

Appellant is engaged in the purchase and sale of automotive products manufactured by its parent corporation, The Gates Rubber Company.[4] Appellant is a Colorado corporation, based in Denver. As it relates to Ohio, appellant's sales structure is as follows:

Doing business under the name of National Products, Inc., appellant sells its line of "Modac" brand automotive parts to NAPA distribution centers in Ohio. There are three NAPA distribution centers (Cleveland, Cincinnati and Columbus) which are appellant's sole customers in Ohio. NAPA is a nationwide affiliation of automotive parts businesses which buy goods from automotive manufacturers and distribute them to retailers. Modac is simply one such line purchased by NAPA. These distribution centers constitute a first tier of sales distribution.

The NAPA distribution centers sell the different manufacturer's automotive products under the NAPA brand name to a second tier of distribution known as "jobbers." Jobbers are intermediate wholesalers.

In turn, jobbers sell these parts to the third and final tier of customers, retail dealers and fleet operators. Retail dealers are comprised of stores, gas stations and service garages. Fleet operators run truck lines.

The board described appellant's sales operations in Ohio as follows[5]:

"With regard to the appellant's automotive parts sales in Ohio the selling force is comprised of two levels: a zone manager and a district manager (ST. 24). The district manager's function is to call upon and give service to distribution centers, 'jobbers,' and 'dealers' (R. 4). By distribution center is meant the N.A.P.A. distribution center which is the sole customer of the appellant in Ohio (R. 6). The services rendered by the appellant's district manager at the distribu-

---

[4] Vern Thorn testified that appellant's sole line of automotive goods sold in Ohio consists of fan belts, radiator hoses, air, water and heater hoses and hydraulic hoses.

[5] Appellant conceded in its appeal to the board that it was not contesting any factual questions, but rather disagreed with the commissioner's conclusions of law.

tion center include checking inventory levels and records and reporting his findings to either the distribution center's purchasing agent or operations manager (R. 7). The district manager also inspects failed merchandise at the distribution center. After verifying failure, the district manager obtains the part number and the price on the failed item and lists this information on a credit form which he in turn signs and mails to Denver. Thereafter, the district manager oversees the destruction of the failed item so as to insure that a subsequent credit is not given on this same article (R. 22-24). The Denver office has never denied credit determined to be due on failed merchandise by district managers (R. 31). In addition to the above-mentioned duties of the district manager at the distribution center, he is directed by the appellant to maintain contact with the distribution center's Service, Purchasing, and Operations Manager in order to 'see if there are any particular problems [he] can handle " 'right now' " ' (Ex. A).

"The one thing the district manager does not do at the distribution center is solicit orders. The distribution center obtains the appellant's product by personally ordering these productions on a weekly basis from the taxpayer's Denver facility (R. 7-8, 29-30).

"The efforts of the appellant's district manager are not confined to the distribution center. The district manager routinely calls upon 'jobbers' or customers of the distribution center in his district. In calling upon a 'jobber' the district manager routinely: checks the 'jobber's' stock; replaces worn packaging; updates the prices of the 'jobber's' catalog with price sheets carried along with him; and passes on promotional material (R. 9-11). Additionally, the district manager, in company with a 'jobber,' is directed to call upon 'dealers' or a customer of the 'jobber' (R. 11). In making such calls, the primary duty of the district manager, as expressly directed by the appellant, is selling (Ex. B.).

"In making calls at the 'dealer' level, which consists of gas stations, garages and the like, the district manager routinely: installs display boards by nailing them to a wall; straightens up, updates, and adds to the dealer's *Modac* inventory; changes over competitive lines of products to the *Modac* brand and, in so doing, changes the identification number of the competitor's product to the corresponding *Modac* part number and

changes the package to one labeled with the *Modac* brand; promotes sales contests; and leaves current catalogs and price sheets (R. 14-18; Ex. C).

"The district manager also makes calls on the 'fleet' customers or trucking companies in his district. The 'fleet' customer is the customer of a 'jobber.' In calling upon a 'fleet,' the district manager's efforts are basically the same as at the 'dealer' level. The district manager provides and installs belts and hooks to display and identify the taxpayer's product. Further, the district manager attempts to sell the *Modac* brand of products and obtain commitments from 'fleet' customers to change over from a competitor's inventory (R. 19-21, Ex. D)."

Both the commissioner and the board concluded that the above activities exceeded "mere solicitation of orders and thus the prohibition imposed by 15 U.S.C. Sec. 381 (P.L. 86-272) was inapplicable."

The authority cited by the board in its decision to affirm the commissioner was *Heublein, Inc., v. South Carolina Tax Comm.* (1972), 409 U. S. 275, the United States Supreme Court's most recent interpretation of Section 381, Title 15, U. S. Code. The Court analyzed the intent of Congress in enacting the statute:

"*The impetus behind the enactment of §381 was this Court's opinion in Northwestern States Portland Cement Co. v. Minnesota, 358 U. S. 450 (1959). There we held that 'net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same.' 358 U. S., at 452.* Congress promptly responded to the 'considerable concern and uncertainty' and the 'serious apprehension in the commercial community' generated by this decision by enacting Pub. L. 86-272, 73 Stat. 555, 15 U.S.C. §381, within seven months.

"*In this statute, Congress attempted to allay the apprehension of businessmen that 'mere solicitation' would subject them to state taxation.* Such apprehension arose because, as businessmen who sought relief from Congress viewed the situation, *Northwestern States Portland Cement* did not adequately *specify what local activities were enough to create a 'sufficient nexus' for the exercise of the State's power to tax.* Sec-

tion 381 was designed to define clearly a lower limit for the exercise of that power. Clarity that would remove uncertainty was Congress' primary goal.***

"Congress recognized***that the accommodation of local and national interests in this area was a delicate matter. The committees reporting the bill to the House and Senate emphasized the difficulty of devising appropriate limitations on state taxing powers. Both Committees called their bills temporary solutions to meet only the most pressing problems created by *Northwestern States Portland Cement.***"* (Emphasis added.) *Id.,* at 279-281.

That Congress has achieved its goal of providing a clear standard "that would remove uncertainty" appears doubtful, since various jurisdictions conflict in their interpretations of this statute.

Indeed, in *United States Tobacco Co.* v. *Commonwealth* (1978), 478 Pa. 125, 386 A. 2d 471, certiorari denied (1978), 439 U. S. 880, the Pennsylvania Supreme Court noted that the *Heublein* decision "is uninstructive on the proper interpretation of 'solicitation'***." *Id.,* at 133. The court concluded that the statutory language should be broadly construed.[6] The Pennsylvania court relied upon a recent New York state decision, *Gillette Co.* v. *State Tax Comm.* (1977), 56 A.D. 2d 475, 393 N.Y. Supp. 2d 186, affirmed (1978), 45 N.Y. 2d 846, 410 N.Y. Supp. 2d 65, in support of its view.

Both *United States Tobacco* and *Gillette* share facts similar to the instant case. Gillette had no place of business in New York, did no manufacturing there, had no inventory there other than salesmen's samples and filled all orders from outside the state. United States Tobacco Company shared similar circumstances and, additionally, had 10 "missionary representatives," furnished with company cars, who visited independent wholesalers to inform them of company activities and promotions and, sometimes, to take orders for appellant's products, which were filled and shipped from another state. The representatives had no authority to accept orders although they made "incidental" sales to retail customers. They also set

---

[6] Nevertheless, the majority in *United States Tobacco* acknowledged that if a business is "involved in something more than solicitation" (without determining how much more), a "state may validly tax that portion of the corporation's taxable income attributable to activity within the state." *Id.,* at 133.

up counter displays and gave away free samples of their product in exchange for counter space.

The Pennsylvania court concluded that such activity was exempt from income taxation pursuant to federal law.

However, a dissenting judge pointed to a contrary result in *Clairol, Inc.*, v. *Kingsley* (1971), 402 U. S. 902, in which the United States Supreme Court dismissed the case for want of a federal question. The dismissal thus left standing the decision of the New Jersey Superior Court: *Clairol, Inc.*, v. *Kingsley* (1970), 109 N.J. Super. 22, 262 A. 2d 213, affirmed (1970), 57 N.J. 199, 270 A. 2d 702. The facts in *Clairol* in our judgment are similar to those in the instant case. There, the court ruled that a sufficient nexus existed between the state and Clairol's business activities to warrant taxation as constitutionally lawful.

In short, the jurisdictions are divided as to how strictly the federal statute should be construed.[7] The United States Supreme Court has offered little or no guidance to resolve the issue.

In the instant case, appeals from the board are governed by R. C. 5717.04. That statute simply requires this court to determine whether the decision below is reasonable and lawful.

A review of the record satisfies us that appellant's sales activity in Ohio significantly exceeded mere solicitation. Appellant's zone and district managers performed functions

---

[7] In *Gillette, supra,* the New York State Tax Commission concluded that Gillette's salesmen had practiced "merchandising": The salesmen would visit retailers and "review" the Gillette displays to ensure that they were attractive and in saleable condition. The court, however, disagreed with the commission's conclusion that such "merchandising" activity constituted anything more than "solicitation" and therefore nullified the tax.

On the other hand, in *Clairol, supra,* Clairol's representatives occasionally took inventory of retailer's stock and additionally employed "technicians" in New Jersey to instruct Clairol's customers in how to use its products. Without deciding whether, without the technicians, Clairol's activities exceeded solicitation, the New Jersey Superior Court concluded that Clairol was not immune from taxation under Section 381, Title 15, U.S. Code. Additionally, in *Miles Laboratories, Inc.*, v. *Department of Revenue* (1976), 274 Ore. 395, 546 P. 2d 1081, the state of Oregon denied Section 381 immunity where salesmen arranged advertising displays, maintained stock to replace damaged merchandise, and serviced accounts.

The facts in the instant case more closely resemble the additional activities performed in *Clairol* and *Miles* than the more passive duties of reviewing displays as carried out by Gillette's representatives.

more commonly related to maintaining an on-going business operation. They constantly upgraded stock, maintained current inventories, removed old, defective products and ensured proper credit for them, advised sellers on methods to improve their inventory, negotiated sales between jobbers and dealers, completely changed over competitive products to the Modac line—in short, appellant helped run these businesses in Ohio. Such practices did more than promote goodwill among appellant's customers; rather, they enabled appellant to assume control over its Ohio operations, generating greater income than could be achieved simply through the solicitation of orders. Indeed, appellant could block out the competitive line on which the commissioner made an assessment and substitute its own line on which appellant resists assessment.

We conclude that the board properly found that appellant's business in Ohio involved "something more than solicitation." Therefore, we find that a sufficient nexus existed for the state to exercise its taxing authority in compliance with the requisites of the Commerce Clause of the United States Constitution. *Heublein, Inc.,* v. *South Carolina Tax Comm., supra; Clairol, Inc.,* v. *Kingsley, supra* (109 N.J. Super. 22). The decisions of the board are reasonable and lawful.

Accordingly, we overrule appellant's assignment of error.

*Decisions affirmed.*

CORRIGAN and COOK, JJ., concur.

COOK, J., of the Eleventh Appellate District, sitting by designation in the Eighth Appellate District.