WILLIAM WRIGLEY, JR. CO., Petitioner-
Respondent-Petitioner,

v.

Wisconsin DEPARTMENT OF REVENUE,
Appellant.

Wisconsin DEPARTMENT OF REVENUE, Peti-
tioner-Appellant,

v.

WILLIAM WRIGLEY, JR. CO., Respondent-
Petitioner.

Supreme Court

*No. 88-2265. Argued October 31, 1990.—Decided February 19,
1991.*

(Also reported in 465 N.W.2d 800.)

For the petitioner-respondent-petitioner, William Wrigley, there were briefs by *Barbara J. Janaszek, Richard J. Sankovitz* and *Whyte & Hirschboeck, S.C.,* Milwaukee and *H. Randolph Williams* and *Baker & McKenzie,* of counsel, Chicago, Illinois and oral argument by *Ms. Janaszek.*

For the appellant, Wisconsin Department of Revenue, the cause was argued by *F. Thomas Creeron, III,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

DAY, J. This is a review of a court of appeals decision which reversed an order of the circuit court for Dane county, the Honorable Martha J. Bablitch, Reserve Judge, presiding. The circuit court, reversing an order of the Wisconsin Tax Appeals Commission, held that under 15 U.S.C. sec. 381, the Wisconsin Department of Revenue (DOR) does not have the power to tax the net income of the William Wrigley, Jr. Company (Wrigley) for the years 1973 to 1978. The circuit court found that Wrigley's activities in Wisconsin were "inextricably connected to 'solicitation,' " as that term is used in 15 U.S.C. sec 381. 15 U.S.C. sec. 381 provides in part as follows:

(a) No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce *if the only business activities within such State* by or on behalf of such person

57

*during such taxable year are* either, or both, of the following:

(1) *the solicitation of orders* by such person, or his representative in such State for sales of tangible personal property, which orders are *sent outside the State for approval or rejection, and if approved, are filled by shipment or delivery from a point outside the State;* (emphasis added) *. . ..*

Because the circuit court held that the DOR is prohibited from assessing a tax on Wrigley, it did not decide the interest rate to be applied to the tax.

The DOR appealed, and the court of appeals reversed the order. *William Wrigley, Jr. Co., v. DOR,* 153 Wis. 2d 559, 579, 451 N.W.2d 444 (Ct. App. 1989) (Dykman, J., dissenting). The court of appeals determined that the solicitation of orders does not encompass post-sale activities which are not " 'inextricably related' " to the solicitation of orders. *Id.* at 569. It held that since Wrigley engaged in such activities, Wisconsin is not prohibited from taxing Wrigley. *Id.* at 577. In addition, the court of appeals held that the franchise tax was "delinquent," and therefore subject to an eighteen percent penalty interest under sec. 71.13(1)(a)[1] and 71.10(9)(a), Stats. 1985–86.[2] *Id.* at 579. Wrigley peti-

---

[1]Section 71.13(1)(a), Stats., 1985–86, provides in part as follows:

**Collection of delinquent taxes.** (1)(a) Income and franchise taxes shall become delinquent if not paid when due under s. 71.10(9), and when delinquent shall be subject to interest at the rate of 1.5% per month until paid . . ..

1987 Act 312 renumbered the statute as sec. 71.82(2)(a).

[2]Section 71.10(9)(a), Stats., provides:

**Filing returns; payment of tax; tax refunds and credits; nonresident contractor's surety bond; withholding statements and wage reports . . ..** (9) All income and franchise taxes shall

tioned the court for review which was granted.

This case presents two issues for review: (1) Did Wrigley's activities in Wisconsin go beyond the "solicitation of orders" as that term is used in 15 U.S.C. sec. 381, so that Wisconsin may assess and collect a tax on Wrigley's net income for the years 1973 to 1978, and (2) if Wrigley's activities are taxable, are the assessed taxes "delinquent" and therefore subject to an eighteen percent penalty interest rate pursuant to sec. 71.13(1)(a), Stats.? We conclude that Wrigley's activities in Wisconsin did not go beyond the "solicitation of orders" as that term is used in 15 U.S.C. sec. 381. Therefore the DOR may not assess and collect a tax on Wrigley's net income for the years 1973 to 1978. Because we hold that the DOR is prohibited from taxing Wrigley's net income, we do not reach the second issue.

On October 6, 1980, the DOR issued Wrigley a "Notice of Franchise Tax Assessment." The notice stated that the DOR was assessing Wrigley $246,614.04 in franchise taxes for the years 1973 through 1978 because Wrigley had been engaging in corporate business activities in Wisconsin during those years. In addition, since Wrigley had not filed Wisconsin franchise tax returns, the DOR assessed Wrigley penalties, including an eighteen percent delinquent penalty interest.

Wrigley objected to the assessment, claiming that it did not engage in business in Wisconsin in a manner sufficient to subject it to Wisconsin's taxing jurisdiction. The DOR denied Wrigley's petition for a redetermina-

be paid to the department of revenue, at its office at Madison or at such other place the department designates. (a) Corporation franchise and income taxes not paid on or before the 15th day of the 3rd month following the close of the income year, shall be deemed delinquent.

tion of taxes, and assessed Wrigley a total of $271,707.63 in taxes and penalties.

Wrigley appealed to the Tax Appeals Commission (Commission). On August 26 and 27, 1985, a hearing was held before Commissioner William Bradford Smith, acting as a hearing examiner. Before the Commission could issue a decision, Mr. Smith left the Commission because of a legislative reorganization. On November 18, 1986, the Commission rendered its decision without consulting Mr. Smith. It concluded that Wrigley's activities in Wisconsin went beyond the "solicitation of orders" protected by 15 U.S.C. sec. 381, and it upheld the DOR's assessment. The Commission also concluded that Wrigley was not subject to the delinquent penalty interest rate because the taxes had not yet become due, and could therefore not be considered "delinquent." Instead, the taxes were subject to the legal rate of interest, found in sec. 71.09(5)(a), Stats. 1985–86.[3]

Both Wrigley and the DOR appealed. On August 20, 1987, the Dane County Circuit Court, Judge Michael Nowakowski, presiding, reversed the Commission's decision. The court found that since several of the Commission's findings might have been affected by the weight and credibility of the testimony at the hearing, due process required that the Commission consult Mr. Smith before deciding the case. The court also questioned some of the Commission's findings of fact, and stated that an analysis of Wrigley's activities was to be done on an annual basis, not in the aggregate. We note that 15

---

[3]Section 71.09(5)(a) Stats. 1985–86 provides:

**Payment of estimated taxes.** (5)(a) In assessing taxes interest shall be added to such taxes at 12% per year from the date on which such taxes if originally assessed would have become delinquent if unpaid, to the date on which such taxes when subsequently assessed will become delinquent if unpaid.

U.S.C. sec. 381 prohibits a state from imposing a net income tax "for any taxable year" if a person's business activities "during such taxable year" are limited to those described in the statute. *See also Ringgold Coal Mining Co. v. Taxation Division Director,* 4 N.J. Tax 321 (Apr. 29, 1982) (court analyzed company's activities on an annual basis). The court did not reach the issue of the penalty interest rate assessment. The case was remanded to the Commission for further proceedings consistent with the court's ruling.

On remand, the Commission met with Mr. Smith and heard his views on the credibility of the witnesses and the weight to be accorded their testimony. Mr. Smith also filed a written statement with the Commission, stating that he found the Wrigley witnesses' testimony to be "extremely credible," and that he would have issued proposed findings of fact, conclusions of law, and an order in Wrigley's favor. A three-member majority of the Commission, with one member dissenting and one not participating, reinstated the original decision and order. The Commission clarified its original findings and specifically stated that it never questioned the credibility of the witnesses: their testimony was "completely accepted and accorded substantial weight."

Both Wrigley and the DOR appealed, and the circuit court consolidated their appeals. In examining the record, the circuit court found that some of the Commission's findings of fact were not supported by the evidence in the record. In addition, the Commission "did not purport to examine the rationale of the statute itself (15 U.S.C. sec. 381), its legislative history, or the cases from other states which have construed it in a variety of circumstances." Instead, the Commission relied on the DOR's nexus regulations promulgated in 1979. It also relied on guidelines set forth in a resolution of the Multi-

state Tax Commission, a group of state revenue agents. *See* State Tax Guide, Multistate Taxation, sec. 351, (CCH 1980). In analyzing Wrigley's activities, the Commission applied these guidelines, which were not cited by either party, and did not refer to case law, cited by both parties.

The circuit court, in interpreting 15 U.S.C. sec. 381, analyzed the approaches other state courts have taken and the statute's legislative history. The circuit court concluded that the activities of Wrigley's salespeople were "solicitation" or so "inextricably connected to solicitation" as to amount to the same thing. Finally, the court stated that even if some of Wrigley's activities were viewed as sales, they were "infrequent exceptions to Wrigley's practice and of *de minimis* value compared to its total revenues." Finding Wrigley not liable for the franchise tax, the court did not reach the penalty interest issue.

The DOR appealed. In a split decision, the court of appeals reversed. *Wrigley,* 153 Wis. 2d at 579. Although it acknowledged that the circuit court's opinion was "thoughtful, thorough and well-reasoned," the majority of the court of appeals concluded there was substantial evidence to support the Commission's order. *Id.* at 571. Additionally, in determining which activities of a company go beyond "solicitation," the court employed a pre-sale/post-sale test. *Id.* at 577. It held that solicitation included "acts which, according to custom and practice in the particular industry, are those that lead to the placing of orders by customers." *Id.* at 569. The court of appeals also held that "solicitation of orders" should not encompass "post-sale activities that are not closely or 'inextricably related' to the solicitation of orders." *Id.* The court concluded that Wrigley engaged in such post-sale activities, lending evidentiary support to the Com-

mission's order. *Id.* at 571. The court of appeals also held that Wrigley was liable for the eighteen percent delinquent penalty interest on the tax. *Id.* at 579.

Judge Dykman, in his dissent, stated that "the majority should have analyzed this case in the context of the manner by which the chewing gum industry sells its product." *Id.* at 580. Wrigley's salespeople were making the product attractive to induce customers to place an order. *Id.* Creating an attractive display is an important part of selling gum—an "impulse sale" product. *Id.* Judge Dykman stated that the sum of Wrigley's activities does not remove Wrigley from the protection of 15 U.S.C. sec. 381. *Id.* Instead, the sum of the questioned activities is *de minimis. Id.* at 581.

Wrigley petitioned for review, and on February 20, 1990, this court granted Wrigley's petition.

Wrigley is an Illinois corporation engaged in the business of manufacturing and selling chewing gum products. Its headquarters are in Illinois. It files tax returns in Illinois and in eight other states in which it has sales offices, warehouses, and/or manufacturing facilities. In addition, Wrigley has been declared to be under the protection of 15 U.S.C. sec. 381 in New York and North Dakota, where it engages in activities similar to those performed in Wisconsin. (Transcript of Hearing, August 26, 1985, pp. 33–35.)

Wrigley is not licensed to do business in Wisconsin; nor has it ever filed a tax return or paid taxes in Wisconsin. From 1973 to 1978, Wrigley's volume of sales in Wisconsin ranged from $2,797,055 to $4,392,202.

During the years in question, 1973 to 1978, Wrigley had few contacts with the state of Wisconsin. It did not own or lease any real estate in Wisconsin; it had no bank accounts; it did not own or operate a manufacturing or "warehouse facility"; it had no telephone listing; it did

not own or operate a training facility; and it did not store inventory, other than samples carried by sales representatives.

All orders for Wrigley products were approved in Chicago. All pricing and credit transactions took place in Chicago as well. The deliveries for orders solicited by agents in Wisconsin were made from outside the state by common carrier.

Wrigley's advertisements, including television and radio spots, appeared in Wisconsin. The company also placed coupon ads in Wisconsin newspapers. All such advertising was purchased and managed through an independent advertising agency in Chicago.

From 1973 to 1978, Wrigley had several types of sales employees working in Wisconsin. The sales or "field" representatives solicited orders within a territory. The regional sales managers would oversee the field representatives in the several territories of their assigned region. They would also solicit "key" accounts within the region. Finally, the district managers were responsible for the several regions which made up their districts.

From 1973 through 1978, Wrigley employed four or five field representatives to service Wisconsin accounts. Most of the field representatives lived in Wisconsin, and each one was supplied with a company car. Wrigley reimbursed the field representatives for gas and service expenses, business expenses, and long distance phone charges.

The field representatives were responsible for soliciting orders from approximately thirty to fifty direct accounts. A direct account is primarily a wholesaler, billed directly for products it receives from a Wrigley manufacturing facility. The field representatives were also responsible for regularly contacting between 400 and

650 indirect accounts. An indirect account is primarily a retailer that receives products from a wholesaler.

John Kroyer, a district manager during the period in question, testified that:

> Wrigley chewing gum [is] approximately a ninety-four or ninety-five percent impulse item; in other words, it's not a planned purchase . . .. [I]t's one thing that's of utmost importance that we have fresh product available to the consumer at all times . . .. [E]ventually it's going to affect your sales . . .. You have to have it visible to the consumer. They will not ask for it . . .. So sales and merchandise goes hand in hand due to the nature of our product.

Therefore, when contacting retailers, the field representatives ensured that the retailers had adequate inventories of all brands and pack sizes of gum, permitting the retailers to effectively display and promote Wrigley products. This involved replacing stale gum with fresh gum when the product was outdated at no cost to the retailer. Gum has a "shelf life" of about six months. The stale gum was disposed in a Wisconsin landfill or sent back to Chicago by common carrier to be destroyed.

The field representatives also engaged in "agency stock checks" about once a month. This occurred when a field representative put up a new stand and stocked it with gum because the retailer did not want to wait for a wholesaler to come and fill the stand. The field representative would send a report called an "agency stock check" to the Wrigley office in Chicago. The office would then bill the wholesaler. The wholesaler would bill the account and replace the field representative's supply of product with the amount with which the field representative stocked the account's stand. This amount was usually fifteen to twenty dollars worth of gum.

The product used for agency stock checks and exchanging stale gum for fresh gum came from the field representative's supply of gum. Each of the four or five representatives carried a supply of gum with a wholesale value of approximately $1,000, with thirty-five to forty percent of the supply being stale gum. This supply of "samples" was carried as inventory on Wrigley's books.

Another way in which the field representatives increased sales was to set up display racks for accounts. These display racks were furnished to an account free of charge. Once the display rack was set up, title to it would pass to the account. The field representatives were not required to account to Wrigley for the display racks. Wrigley did not carry the racks as inventory or fixed assets.

In 1976, after Wrigley terminated one particular field representative, the company needed a place to store the representative's company car and supply of products until a new representative was hired. Normally, the company would store the car at a dealership, but in this instance the district manager could not locate a reasonable rental space for the car. Wrigley allowed the district manager to rent storage space in a warehouse, in his own name, for the three to four month interim until a new representative was hired. The rental cost of approximately twenty-five dollars per month was charged to the district manager's expense account.

After the new field representative was hired, he had no room to store the gum and displays in his home. Wrigley gave him permission to continue the warehouse rental for storage space. This was not Wrigley's common practice, but based on the specific facts of the situation, the company made an exception to the rule. The storage space was rented through the year 1978.

From 1973 to 1978, Wrigley employed two different individuals who served as the regional sales manager for Wisconsin. John Kroyer had this position from 1973 to 1976, and Gary Hecht was the regional sales manager from 1976 to 1978. Both of these individuals lived in Wisconsin and worked out of their home during their employment. Kroyer testified that Wrigley issued him a file cabinet for his in-home office. In addition, he declared an income tax deduction for the office in his home. Like the field representatives, the regional sales managers had a company car, and Wrigley reimbursed them for gas and service expenses, business expenses, and long distance phone charges.

The regional sales managers were responsible for increasing volumes, sales, distribution, and improving merchandising. They were also directly responsible for "key" accounts—the direct accounts which made up eighty percent of the company's total volume. Kroyer testified that eighty to eighty-five percent of his time was spent working in the field on sales activities. Administrative activities made up the other percentage of his time. Hecht, on the other hand, testified that he spent ninety to ninety-five percent of his time in the field engaging in supervisory or managerial activities.

When a field representative vacancy arose, the regional sales manager would get permission from the Chicago office to fill the vacancy. He would then locate applicants, using an employment agency or by placing an ad in a newspaper. The regional manager would interview applicants at a coffee shop or restaurant, or sometimes at a hotel. The applicant would be hired if the district manager approved of the regional sales manager's recommendation. The regional sales manager did not have authority over a field representative's compensation, nor did he have the authority to discharge a field

representative. However, regarding one particular field representative, Hecht testified: "I'm not entirely certain if I fired [him] or if he quit. I just can't remember." The regional sales managers did make recommendations to the district manager regarding the field representatives' compensation and performance, but the district manager always had the "final say" in the matter.

Once a new field representative was hired, the regional sales manager was responsible for training. From 1973 to 1978, Wrigley did not have a formal training program or a training center. Instead, the regional sales manager would instruct the new employee to accompany another top field representative in the field. So while the new employee was being trained, the field representatives were working the territory. Kroyer testified that "[a]ll the training was done in the field."

About once or twice a year, the regional sales manager would hold a sales meeting with all the field representatives of his region. Kroyer usually conducted the meetings out of his home. Hecht held the meetings at a hotel or motel. The meetings usually lasted about a full day and involved strategies to obtain greater sales. Occasionally, a sales meeting would be held in conjunction with the introduction of a new brand of gum or new packaging. The regional sales managers' other communications with the field representatives were made by telephone, in written form, or in a one-to-one meeting, usually held at a coffee shop.

Wrigley's "position description" of the regional sales manager, dated September, 1979, states that the regional sales manager "represents the company on credit problems as necessary." When questioned about this duty, Hecht testified, "I have no idea what that refers to. It's never came up in the nine or ten years that I have been regional sales manager, and nobody has ever

brought to my attention on my performance appraisals that I was neglecting one of my duties." Hecht did receive copies of correspondence from the Wrigley credit department. He did not take any action on these letters. When Kroyer received a copy of a credit letter, he would occasionally identify the credit problem and try to get the account and the credit department to communicate in order to solve the problem.

Overseeing the regional sales manager was the district manager, who was responsible for all activities that took place in his district. This included making decisions on hiring, firing, compensation, and sales strategies. The district manager spent very little time in Wisconsin, approximately six to nine days a year. These days were spent either in the field calling on a customer, or attending a sales meeting.

Whether or not Wrigley's activities go beyond "solicitation of orders" under 15 U.S.C. sec. 381 requires the application of facts to a statute. This is a question of law. *Local No. 695 v. LIRC,* 154 Wis. 2d 75, 82, 452 N.W.2d 368 (1990). " 'The black letter rule is that a court is not bound by an agency's conclusions of law.' " *Id.* (citing *West Bend Education Ass'n. v. WERC,* 121 Wis. 2d 1, 11, 357 N.W.2d 534 (1984)). In some instances, however, a court will give deference to an agency's interpretation of a statute. *West Bend,* 121 Wis. 2d at 12. Section 227.57(10), Stats., 1987–88 provides that in reviewing an agency's decision "due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it." In addition, "[w]hen the legislature charges an administrative agency to apply and enforce a particular statute . . . the agency's construction and interpretation of the statute

are entitled to great weight and any rational basis will sustain its practical interpretations." *School Dist. of Drummond v. WERC*, 121 Wis. 2d 126, 132–133, 358 N.W.2d 285 (1984). As the court of appeals determined, sec. 73.01(4)(a), Stats. 1987–88[4] does not specifically empower the Commission to interpret the federal statute at issue here. *Wrigley*, 153 Wis. 2d at 565. We agree with the court of appeals that the Commission's decision should not be given great weight.

Further, "where a legal question is intertwined with factual determinations or with value or policy determinations or where the agency's interpretation and application of the law is of long standing, a court should defer to the agency which has primary responsibility for determination of fact and policy." *West Bend*, 121 Wis. 2d at 12 (footnote omitted). The court in *West Bend* also noted that "[w]here the question is 'very nearly' one of first impression, and the agency has not developed expertise or a body of precedent on the question, the court is to give the agency's conclusion 'due weight' or 'great bearing' but not 'great weight.' " *Id.* n.12; *see also Local 695*, 154 Wis. 2d at 83. Even though an agency may have never interpreted a particular statute against facts of first impression, because the agency has prior experience in interpreting the statute, the agency's deci-

---

[4]Section 73.01(4)(a), Stats. 1987–88 provides in part:

**Tax Appeals Commission.** **(4)**(a) Subject to the provisions for judicial review contained in s. 73.015, the commission shall be the final authority for the hearing and determination of all questions of law and fact arising under sub. (5) and ss. 70.11(21), 70.38(4)(a), 70.64, 70.995(8), 72.86(4), 1985 Stats., 76.38(12)(a), 76.39(4)(c), 76.48(6), 77.26(3), 77.59(6)(b), 78.22, 139.03(4), 139.315 and 139.78 and subch. XIV of ch. 71.

sion will be accorded due weight or great bearing. *See Local 695,* 154 Wis. 2d at 84.

Finally, "[w]here a legal question is concerned and there is no evidence of any special expertise or experience, the weight to be afforded an agency interpretation is no weight at all." *Id.* The scope of "solicitation" under 15 U.S.C. sec. 381(b)(1) has never been interpreted by the Commission under a set of facts similar to Wrigley's, nor under any set of facts at all. The DOR stated in its brief that "the precise scope of the statute was not at issue until its . . . decision in this case." For this reason, we review the Commission's interpretation of "solicitation" *de novo.* Additionally, we give no deference to the decisions of the circuit court and court of appeals on this question of law. *See Eby v. Kozarek,* 153 Wis. 2d 75, 79, 450 N.W.2d 249 (1990).

As to the Commission's findings of fact, it stated that its "findings were based on the unimpeached, credible testimony of petitioner's own witnesses which are supported by the record." Since it is the Commission's function to determine the credibility of the witnesses and the weight of the evidence, we will affirm the Commission's findings of fact "if they are supported by substantial evidence in view of the entire record." *Muskego-Norway C.S.J.S.D. No. 9 v. W.E.R.B.,* 35 Wis. 2d 540, 562, 151 N.W.2d 617 (1967).

Article 1, sec. 8, clause 3 of the United States Constitution gives Congress the power to regulate interstate commerce. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1 (1824). This includes the power to regulate state taxation, to the extent that it affects interstate commerce. *Arkansas-Best Freight System, Inc. v. Cochran,* 546 F. Supp. 904, 910 (M.D. Tenn. 1981). On September 14,

1959, Congress exercised this power when it enacted Public Law 86-272, codified in 15 U.S.C. sec. 381. The law prohibits a state from taxing income derived from interstate commerce if the only activities of the out-of-state person within the state are the solicitation of orders sent outside the state for approval and shipment. "Hence, the immunity provisions . . . are not available if, for example, the out-of-state company maintains a warehouse or a stock of goods within the State." Senate Report No. 658, 86th Cong., 1st Sess. 2, *reprinted in* 1959 U.S. Code Cong. & Admin. News 2548, 2554. 15 U.S.C. sec. 381 does not define which activities are included in "solicitation of orders." Further, the one instance in which the United States Supreme Court addressed the application of the statute, it did not define the scope of "solicitation of orders." *See Heublein, Inc. v. South Carolina Tax Comm'n.,* 409 U.S. 275 (1972). "We need not decide whether, as the State urges, the actions of Heublein's representative in maintaining a local office, meeting with retailers, distributing promotional literature, and personally delivering some orders to the wholesaler, do not fall within the term 'solicitation' " *Id.* at 278.

Since the statute does not define the meaning nor the scope of "solicitation of orders," we turn to the legislative history of 15 U.S.C. sec. 381 to determine its effect and purpose. *See Labor & Farm Party v. Elections Board,* 117 Wis. 2d 351, 355–356, 344 N.W.2d 177 (1984). Citing *Hervey v. AMF Beaird, Inc.,* 250 Ark. 147, 464 S.W.2d 557 (1971), the DOR contends that "the legislative history of the act clearly indicates that a narrow construction of the term 'solicitation of orders' was intended by Congress." *Id.* at 562 (citing 2 U.S. Code Cong. & Adm. News 2548 et. seq. (9th Cong., First Ses-

sion, 1959)). The court in *Hervey* does not specifically identify any language in the legislative history which leads it to this conclusion.

We fail to see how the legislative history "clearly indicates" a narrow construction of "solicitation of orders." According to Senate Report No. 658, in support of 15 U.S.C. sec. 381, the statute was meant to:

> deal with the problem arising by reason of à recent decision of the U.S. Supreme Court in Northwestern States Portland Cement Co. v. State of Minnesota and T.V. Williams, Commissioner v. Stockham Valves & Fittings, Inc. (79 S. Ct. 357, 358 U.S. 450, 3 L. Ed. 2d 421 (1959)).
>
> Your committee finds that the broad language used by the Supreme Court in its decision in these cases—
>
>> We conclude that net income from the interstate operations of a foreign corporation may be subjected to State taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State *forming sufficient nexus to support the same.* (358 U.S. 450 at 452).
>
> has created considerable concern and uncertainty. (Emphasis supplied.) . . .
>
> This apprehension is apparently strengthened by the decision of the Louisiana Supreme Court in the Brown-Forman case, which the U.S. Supreme Court refused to review. There the activities of the corporation within the State were apparently limited to the presence of 'missionary men' engaged in solicitation. (Footnotes omitted.)

Senate Report No. 658, 2549. In *Northwestern States,* the court upheld a Minnesota tax on the income of an Iowa cement manufacturer who sent salespeople into

73

Minnesota to solicit orders and to encourage orders from cement users ordering from local wholesalers. 358 U.S. at 454–455. The company also maintained a sales office in Minnesota. *Id.* at 454.

In *Brown-Forman Distill. Corp. v. Collector of Revenue,* 234 La. 651, 101 So. 2d 70, 72 (1958), *cert. dismissed,* 350 U.S. 28 (1959), the court refused to disturb the ruling which allowed the state of Louisiana to tax a Kentucky whisky company. The company's "missionary men" called on wholesalers and also assisted salespeople in obtaining suitable displays for retailers in Louisiana. *Id.* at 70.

This apprehension created by *Northwestern States* and *Brown-Forman* was due to the burden placed on companies attempting to ascertain, with respect to every state in which sales were made, the company's taxable income, and the portion of that income "properly apportioned" to the taxing state. Senate Report No. 658 at 2549–2550. Moreover, each of the states which were taxing business income were using "different definitions and different formulas—thus guaranteeing major compliance headaches for all businesses crossing state lines." *State Taxation of Interstate Commerce: Hearing Before the Committee of Finance,* 86th Cong., First Sess. 4 (1959) (Statement of Sen. John Sparkman).

The Committees studying the legislation concluded that "the uncertainty of interstate tax liability and inevitable new reporting, accounting and tax costs presented a real threat which was inducing retreat of business from the free markets and the deprivation of consumer goods and services to the detriment of the American economy." *International Shoe Co. v. Cocreham,* 246 La. 244, 164 So. 2d 314, 321, *cert. denied,* 379 U.S. 902 (1964) (citing State & Local Tax Report No. 122, sec. 2, page 4). To relieve this undue burden on interstate commerce,

Congress enacted P.L. 86–272, which takes a " 'minimum activities' type of approach" in determining when a company is subject to a state's income tax. Senate Report No. 658 at 2548. "Section 381 was designed to define clearly a lower limit for the exercise of that power [a state's power to tax]. Clarity that would remove uncertainty was Congress' primary goal." *Heublein,* 409 U.S. at 280.

States have not been uniform in interpreting the meaning of "solicitation of orders." The DOR cites as compelling *National Tires, Inc. v. Lindley,* 68 Ohio App. 2d 71, 426 N.E.2d 793 (1980) and *Clairol, Inc. v. Kinsley,* 262 A.2d 213, (N.J. 1970), *cert. dismissed,* 402 U.S. 902 (1971) (dismissed for want of a substantial federal question), two cases which narrowly interpret "solicitation of orders."

In *National Tires,* the appellant, National Tires, "constantly upgraded stock, maintained current inventories, removed old, defective products and ensured proper credit for them, advised sellers on methods to improve their inventory, negotiated sales between jobbers and dealers, completely changed over competitive products to the Modac line—in short, appellant helped run these businesses in Ohio." 426 N.E.2d at 798. The court found that these activities enabled National Tires to "assume control over its Ohio operations." *Id.* Thus, National Tires' business in Ohio involved " 'something more than solicitation.' " *Id.*

In *Clairol,* Clairol sold products to salon wholesalers and had "detail people" having a "technical background" call on beauty salons. 262 A.2d at 217; *See also, Ringgold Coal Mining Company v. Taxation Division Director.* They did "very little as far as order taking." *Clairol,* 262 A.2d at 217. The court held that "Clairol's business activities in New Jersey extend beyond the mere solicita-

tion of orders either on its own behalf or on behalf of its wholesalers." *Id.* at 217–218.

The courts in *National Tires* and *Clairol* did not define solicitation. They merely concluded that the activities in those cases exceeded solicitation. Moreover, in *National Tires,* the company was actually assisting in the operation of the business of its customers. Since Wrigley's activities are not similar to those of *National Tires* or *Clairol,* we do not find either case persuasive.

The DOR cites a number of other cases where courts have found no protection under 15 U.S.C. sec. 381 for various types of businesses, *i.e., National Tires* and *Clairol.* Most of these cases are distinguishable on their facts. Others represent an approach to 15 U.S.C. sec. 381 that we conclude is repugnant to the intent of Congress in passing the legislation. *See United States Tobacco Co. v. Martin,* 304 Ark. 119, 801 S.W.2d 256 (1990) (J. Turner, dissenting).

Finally, the DOR cites tribunals which have interpreted solicitation to include only those activities leading to the placement of orders. *See, e.g., Drackett Products Co. v. Conrad,* 370 N.W.2d 723, 726 (N.D. 1985); *Miles Laboratories, Inc. v. Department of Revenue,* 274 Or. 395, 546 P.2d 1081, 1083 (1976); *In the Matter of Raymond E. Campbell & Associates, Ltd.,* Iowa Department of Revenue and Finance, Iowa Tax Rptr. (CCH) secs. 200-483 (1988). The court of appeals adopted a similar interpretation of solicitation. *Wrigley,* 153 Wis. 2d at 569. "[I]t [solicitation] should not include those acts which follow as a natural result of the transaction . . .." *Id.*

Although the pre-sale/post-sale test may produce consistency and predictability, the test places all the emphasis on *when* the activity occurred. It fails to take into account the *nature* of a company's activities. As

76

Wrigley points out, post-sale activities may share the same qualities and purposes as pre-sale activities: encouraging future orders.

In interpreting "solicitation of orders" under 15 U.S.C. sec. 381, we follow "the well-established rule of statutory construction that nontechnical words and phrases are to be construed according to their common and ordinary usage." *State ex rel. B'nai B'rith F. v. Walworth County,* 59 Wis. 2d 296, 307, 208 N.W.2d 113 (1973). Further, " '[t]he popular or reasonable import of words furnishes the general rule for the interpretation of public laws.' " *Id.* (quoting *State Bank of Drummond v. Nuesse,* 13 Wis. 2d 74, 78, 108 N.W.2d 384 (1961)).

To solicit is "to approach with a request or plea (as in selling or begging)." *Webster's Third New International Dictionary of the English Language,* p. 2169 (unabridged) (1961). We agree with the Pennsylvania court in *United States Tobacco Co. v. Commw.,* 478 Pa. 125, 386 A.2d 471, 478, *cert. denied,* 439 U.S. 880 (1978), that the definition of solicitation not only encompasses a "sales pitch," but it also includes activities incidental to the initial contact between the buyer and the seller:

> When Congress enacts legislation exempting 'solicitation' by an interstate corporation from a state's net income tax, and does so in response to a case where the 'solicitation' involved activity [Brown-Forman] incidental to the initial contact between seller and prospective buyer, we as state courts are bound to give foreign corporations sec. 381 immunity even though their representatives engage in activities incidental to the initial contact between buyer and seller. The question is one of degree.

*Id.*

77

In *United States Tobacco,* the Pennsylvania court held that the United States Tobacco Company was protected under 15 U.S.C. sec. 381, and therefore did not have to pay corporate income tax in that state. 386 A.2d 479. The company employed representatives who called on various retail outlets. *Id.* at 472. These representatives carried samples of new products, purchased from a wholesaler. *Id.* If a retailer purchased some samples, the retailer paid the representative the same amount the representative paid the wholesaler for the samples. *Id.* United States Tobacco's representatives also made sure the company's products were fresh and attractively displayed. *Id.* They also set up counter displays and sometimes gave retailers free samples of tobacco products in exchange for more extensive counter space. *Id.* The court stated:

> [W]e have said that acts of courtesy performed by business solicitors, in order to satisfy or accommodate customers, did not go beyond solicitation; nor was it relevant that the solicitors were provided facilities to carry on their solicitations (citations omitted). The import of these decisions is that 'solicitation' does not stop at the moment a prospective customer [or wholesaler] is asked to consider purchasing the seller's goods: other practices incident to the initial contact between buyer and seller, such as advice on making the product attractive to the ultimate consumer, also fall under the rubric 'solicitation.'

*Id.* at 478. Like Wrigley's activities in Wisconsin, all of United States Tobacco's activities "were a kind of solicitation activity—as much so as the exchanging of friendly amenities between a solicitor and the potential customer." *Id.*

In a similar case, *Gillette Co. v. Tax Comm.,* 56 A.D.2d 475, 481, 393 N.Y.S.2d 186 (1977), the New York Tax Commission claimed that Gillette's activities went beyond "solicitation" of orders in that state. Gillette manufactures and sells personal care products. *Id.* at 477. It employed salespeople who called on indirect accounts in New York and told the accounts about changes in products and promotions. *Id.* at 478. The salespeople also reviewed the account's display of Gillette products to ensure that the products were attractively displayed and in saleable condition. *Id.* In annulling the franchise tax against Gillette, the New York court stated:

> Although it is not possible to state a general rule demarcating solicitation from merchandising, certainly where, as here, the complaining taxpayer owns no real or personal property [except salesmen's samples] in the state and makes no repairs on its goods after sale, the purpose of Public Law 86–272 would be frustrated by permitting the tax. Advice to retailers on the art of displaying goods to the public can hardly be more thoroughly solicitation, i.e., in this context, an effort to induce purchase of Gillette products.

*Id.* at 482.

It is important to note that the New York State Tax Commission, relying on *Gillette, United States Tobacco,* and a New York revenue ruling, has recently determined that Wrigley is entitled to a refund for New York franchise taxes it paid for the years 1975 through 1980. *In the Matter of the Petition of William Wrigley, Jr. Company,* State Tax Comm'n. (March 11, 1987). Wrigley's activities in New York were nearly identical to its activities in Wisconsin:

15. Since a fresh product was necessary for continued sales, if a representative found out-of-date product in a display the representative would exchange, on a stick-for-stick basis, the out-of-date product with fresh product drawn from a small stock of product in his possession. Petitioner did not charge the indirect account for this exchange. The supplies of petitioner's products which were held by the sales representatives at any time, therefore, consisted of both saleable and unsaleable product and had negligible value.

16. On occasion, a sales representative replaced either out-of-date or undisplayed product with stock in an indirect account's storage area.

17. Occasionally, petitioner supplied an indirect account with a display stand on which to display petitioner's product. Petitioner's sales representatives would also participate either alone, or with sales representatives of other companies, in the arrangement of displays. Petitioner supplied these display stands to a retailer free of charge and did not own the stands or consider the stands to be inventory. The stands were purchased from suppliers throughout the United States and were often shipped directly to a customer . . .. In all cases where a sales representative rented garage space to store the automobile, such space was rented by the representative individually and not in the name of petitioner.

*Id.* In interpreting solicitation to include "some activities incidental to offering tangible personal property for sale or pursuing offers for the purchase of tangible personal property," the Commission found that Wrigley's activities in New York constituted "solicitation" within the meaning of 15 U.S.C. sec. 381. *Id.*

The Commission, in its decision in the case before us, determined that Wrigley engaged in the following

activities in Wisconsin which, taken together, exceeded "solicitation of orders."

— replacement of stale gum
— maintaining product displays both as to location design and content
— direct sales of gum by use of 'agency stock checks'
— maintaining offices in home
— conducting regular and periodic training seminars in Wisconsin
— recommending hiring, firing and raises of sales representatives in Wisconsin by regional manager
— involvement in credit transactions by regional manager
— training and supervising sales representatives by regional sales manager
— rental of storage space in Madison, Wisconsin
— the purchase of non-incidental advertising in Wisconsin

Earlier in this opinion, we have set forth in detail the testimony from which this list of summarized activities derives.

In the context of the facts in this case and considering the nature of the chewing gum business, as did Judge Dykman in his dissent, we hold that each of Wrigley's activities in Wisconsin during 1973–1978 were incidental to the solicitation of orders of gum. Any activities described here that could be considered as somehow not being inextricably bound up in solicitation, such as the rare occasions when credit problems were looked into, are so minor as to be *de minimis*. Certainly we do not think they could be of sufficient weight in the flow on

81

interstate commerce as to remove Wrigley from the protection of 15 U.S.C. sec. 381.

When analyzing a claimed immunity under 15 U.S.C. sec. 381, a court should look at whether the activities are closely associated and inextricably bound up with "solicitation of orders." The mere fact that these orders may be future orders does not necessarily result in loss of immunity. Courts should also analyze what is alleged to be "deviations from the norm" and *de minimis* activities. As in the case before us, such activities do not reach a level of activity resulting in loss of immunity. Further, the court should consider activities that are *not* performed, with special reference to Congress' examples of non-immune activities in a state: maintaining a warehouse or a stock of goods. Senate Report No. 658 at 2554. Not only what is done, but what is *not done* in a state bears on the question of whether activities are "solicitation of orders." Finally, the court must consider the type of business involved, and the manner in which products are sold and orders are solicited—such as the sale of gum in the case before us, and the sale of tobacco products in *United States Tobacco.*

As the testimony revealed, gum is an "impulse item." In order to sell, it must be fresh and attractively displayed. Replacing stale gum and maintaining product displays are an important part of obtaining more orders for gum. Moreover, these activities are not "sales." The fresh gum and displays were supplied to customers free of charge. Nor are the "agency stock checks" sales: The field representative never negotiated a price for the gum, never billed the account, and never accepted money for the gum.[5]

---

[5]In his dissenting opinion to the Commission's Order, Commissioner Douglass Bartley commented on the *de minimis* value

As for the regional sales manager's activities, they were part of effectively managing the solicitation of orders. As such, these activities were incidental to the solicitation of orders.

The rental storage space is certainly not the type of warehouse Congress envisioned when it referred to a company losing immunity under 25 U.S.C. sec. 381 for maintaining a warehouse. *See* Senate Report No. 657 at 255. The space was rented for several months to store a representative's company car and supplies. It does not approach the size or type of warehouse needed to store inventory in order to supply the wholesalers and retailers in this state. At the most, it was a minor and *de minimis* deviation from the usual practice.

Regarding the advertising, it too is an important part of soliciting orders. As a medium to alert potential customers of the existence and availability of a company's product, the appearance of Wrigley's ads in Wisconsin are incidental to solicitation of orders for the product.

We would hardly expect Wrigley to cross the state line any time it must engage in activities incidental to placing an order for gum. This would surely be a burden on interstate commerce and would "tend to 'balkanize

of the "agency stock checks," which he referred to as "direct sales."

> Although there is no question that the sales were direct, I conclude that such sales can only be characterized as unusual and infrequent because they were but a pittance. For example in 1978, direct sales amounted to at most $600, or 7/100,000 of one per cent of Wrigley's $4,392,202 of Wisconsin sales that year. Looking at this in a slightly different perspective, direct sales of Wrigley's gum were barely enough to supply three avid, two-pack-a-day chewers with enough Juicy Fruit to last through the year. That's not enough gum to stick jurisdiction on Wrigley even if the chewers are doubling their pleasure.

the American economy,' a result which it was Congress' purpose to prevent." *Gillette Co. v. Tax Comm.,* 56 A.D.2d at 482.

We conclude that Wrigley's activities in Wisconsin did not go beyond the "solicitation of orders" as that term is used in 15 U.S.C. sec. 381. Therefore, the DOR may not assess and collect a tax on Wrigley's net income for the years 1973 to 1978.

*By the Court.*—The decision of the court of appeals is reversed.